1              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF FLORIDA**
2                **GAINESVILLE DIVISION**

3

UNITED STATES OF AMERICA,    )
4                         )
             Plaintiff,   ) Case No: 1:25-CR-12-AW
5                         )
    v.               ) Gainesville, Florida
6                        ) October 1, 2025
                       )
7 ATHARVA SATHAWANE a/k/a    )
"Andy Sathawane,"       )
8                        ) 1:32 p.m.
            Defendant.   )
9 _____)

10            EXCERPT OF JURY TRIAL TRANSCRIPT
11           TESTIMONY OF **MAXINE FAGELBAUM**
       BEFORE THE HONORABLE ALLEN C. WINSOR
12           UNITED STATES DISTRICT JUDGE
           (Pages 1 through 32)
13

14 <u>APPEARANCES:</u>

15

For the Government:    United States Attorney's Office
16                   by:  **ADAM M. HAPNER**
                  300 E. University Avenue
17                   Suite 310
                  Gainesville, Florida 32601
18                   (352) 378-0996
19                   *adam.hapner@usdoj.gov*

20 For the Defendant:     Smith & Eulo
                  by:  **ALEJANDRA CONTRERAS CABALLERO**
21                   2720 NW 6th Street
                  Suite 302C
22                   Gainesville, Florida 32609
                  (585) 576-7255
23                   *alex.c.macias.89@gmail.com*

24

25           *Julie A. Wycoff, RMR, CRR*
        *Official United States Court Reporter*
       *(850) 470-8196 * julieawycoff@gmail.com*

1                     **P R O C E E D I N G S**

2          *(Begin excerpt.)*

3              MR. HAPNER:  The Government calls Maxine Fagelbaum.

4     **MAXINE FAGELBAUM, GOVERNMENT WITNESS, DULY SWORN**

5              DEPUTY CLERK:  Please state your name and spell your

6     last name.

7              THE WITNESS:  Maxine Fagelbaum.  F, as Frank,

8     A-G-E-L-B-A-U-M.

9              DEPUTY CLERK:  Thank you.

10                        **DIRECT EXAMINATION**

11    BY MR. HAPNER:

12    Q.    Good afternoon, ma'am.

13    A.    Hi.

14    Q.    How are you doing today?

15    A.    Good.

16    Q.    Can you tell the jury where you're currently living, like

17    what city?

18    A.    Boca Raton.

19    Q.    Boca Raton in Florida?

20    A.    Right.

21    Q.    And how old are you?

22    A.    87.

23    Q.    I'm sorry to ask you that.

24    A.    That's all right.

25    Q.    Are you currently married?

FAGELBAUM - DIRECT

1    A.    No.

2    Q.    Have you ever been married?

3    A.    Yes.

4    Q.    Does anybody else live with you?

5    A.    My daughter.  She moved down in January.

6    Q.    She moved down in --

7    A.    She's -- from New York, yeah.  She moved here, so she's

8    living with me.

9    Q.    Okay.  And that -- you said that was in January?

10   A.    Yes.

11   Q.    Of 2025?

12   A.    Yes.

13   Q.    Are you retired?

14   A.    Yes.

15   Q.    What did you -- well, when did you retire?

16   A.    Maybe 25 years ago.

17   Q.    What did you do before then for work?

18   A.    I had four nail salons.  Facials, pedicures, waxing,

19   clothing -- all that.

20   Q.    Were those --

21   A.    Well, two were in New York and two in Florida.

22   Q.    Okay.  In the south -- same South Florida area?

23   A.    Yes.

24   Q.    Ma'am, I want to direct your attention now to the earlier,

25   middle part of 2024.  Do you remember that time frame?

FAGELBAUM - DIRECT

1  A.    Yes.

2  Q.    Did you -- did you notice around that time whether or not

3  there were any, I guess, unauthorized charges to one of your

4  financial accounts?

5  A.    Yes.

6  Q.    Can you explain what happened.

7  A.    My credit card.

8  Q.    It was specifically your credit card?

9  A.    Yes.  There were six charges that totaled about $1900.

10  Q.    And you --

11  A.    That I didn't make.

12  Q.    Okay.  And you didn't make those charges --

13  A.    No.

14  Q.    -- and so did you see that on your account statement, or

15  how did you learn about it?

16  A.    On the statement, yes.

17  Q.    And what did you do after you saw those unauthorized

18  charges on your account statement?

19  A.    Well, I had called Amazon and spoke to them, and they

20  wanted me to call Chase, which was the Freedom credit card

21  company, and I did that.  And then right after I spoke to

22  Amazon, I called Chase.  And the woman answered the phone, said

23  Chase, and the whole nine yards, and then she said I'm going to

24  connect you to the fraud department.

25        So she connected me, and somebody -- sounded like a

FAGELBAUM - DIRECT

1    younger man answered, and he asked me very quickly, like maybe

2    one or two questions, and he said, Oh, I'm going to have to

3    connect you to somebody else.

4    Q.    Okay.

5    A.    And he connected me to the fraudster.

6    Q.    Who did you believe -- who do you believe now, to this day,

7    is the fraudster you were speaking to?  Was there a name given

8    to you?

9    A.    Oh, well, he gave me the name.  It was Alvaro Bedoya, that

10   he said.

11   Q.    Alvaro --

12   A.    Bedoya.

13   Q.    How do you spell that last name?

14   A.    B-E-D-O-Y-A.

15   Q.    Okay.  And who did you think Mr. Bedoya worked with?

16   A.    He said he worked for the Federal Trade Commission.

17   Q.    And tell us about your conversation with Mr. Bedoya.

18   A.    Well, he told me that he has to protect my money and that I

19   have to get gold or cash, and he would put it with the Treasury.

20   He would hold everything, and whatever he got would be returned

21   to me after -- oh, they had to give me new ID, they'd have to

22   give me a new Social Security number, and they would take care

23   of everything, and they would -- when I get that new number, I

24   would get my money back --

25   Q.    Okay.

FAGELBAUM - DIRECT

1   A.   -- from the Treasury Department.

2   Q.   All right.  Let me break that down a little bit if I could,

3   please.

4           So when you're speaking to Mr. Bedoya, you believe

5   that he's working for the Federal Trade Commission, correct?

6   A.   Absolutely.  I was connected from Chase.  I thought that he

7   was with Chase.  You know, it was connected --

8   Q.   Sure.

9   A.   -- and that that would be okay.

10  Q.   And so then you -- he told -- did Mr. Bedoya tell you that

11  there -- that your identity had been compromised in addition to

12  your --

13  A.   Oh, yes.

14  Q.   -- Chase card?

15  A.   Yes.

16  Q.   Okay.  Tell me a little bit about how --

17  A.   Yeah.

18  Q.   -- that conversation specifically.

19  A.   He said that my identity was compromised, and they -- the

20  fraudsters know where I live and all my information and that I

21  would be watched by his people to make sure that I would be safe

22  and that nobody would be following me, of the fraudsters and --

23  you know, it was a lot of things that just kept going and -- and

24  I really was stupid enough to believe him, because I kept

25  saying, Well, I called Chase.  They didn't call me, so it's got

1    to be legit.

2    Q.    Understood.  So he -- is it fair to say that Mr. Bedoya

3    convinced you that because of the identity theft situation, the

4    fact that your accounts had been compromised, that you then

5    needed to make financial transactions to protect that money?

6    A.    Right.

7    Q.    Okay.  So tell us about that.  Why -- what exactly did you

8    do to begin protecting your money?

9    A.    I had to wire money.  I had CDs, I had stocks.  I had to

10   get all that money.  I had money market, a lot of different

11   things.

12   Q.    Just in --

13   A.    And I had to get all that money out, a little at a time,

14   you know, like 100,000, 200,000 -- at a time, and they wired the

15   money to my checking account.

16   Q.    Who is they?

17   A.    Whoever, like UBS or wherever the money was.

18   Q.    Okay.

19   A.    Whatever company it was with, they wired that money to my

20   checking account, and then my check from that bank, Flagstar,

21   had to wire that money to the gold dealer, the man that I got

22   gold from.

23   Q.    Okay.  Let me just break that down to make sure we're

24   clear.

25              You mentioned CDs.  In case someone doesn't know what

FAGELBAUM - DIRECT

1    that means, what is a CD?

2    A.    Oh, the certificate of deposit.

3    Q.    Is that a type of investment?

4    A.    Yeah.

5    Q.    And then you also said money market and stocks?

6    A.    Right.

7    Q.    Is it fair to summarize all those accounts as money you had

8    invested for your retirement savings?

9    A.    Absolutely.

10   Q.    Okay.  And then wherever those were held, in whatever type

11   of account or whatever institution they were with, that money

12   over time was then transferred to your checking account via

13   wire?

14   A.    Yeah.

15   Q.    Okay.  And then when you went to purchase gold, you used

16   your checking account balance at that time to do another wire

17   transaction to the gold --

18   A.    Right.

19   Q.    -- dealer?

20   A.    Right.  He told me how much to do each time, how much to

21   send.

22   Q.    He being Mr. Bedoya?

23   A.    Yes.

24   Q.    Did Mr. Bedoya ever tell you what to say if you were

25   questioned by anyone about why you were making these accounts,

FAGELBAUM - DIRECT

1   such as --

2   A.    Yes.

3   Q.    -- your investment brokers, individuals at Flagstar Bank --

4   A.    Yes.

5   Q.    -- for example?

6   A.    He told me that I should say that I want to use that money

7   to invest in gold and just -- then it was crypto, investing in

8   that.  Bitcoin, Ethereum, I had to do that.  And it was just

9   that he made up excuses.

10            And one time it was an amount that was like about

11   $500,000, and he said that I should say that I'm giving my

12   grandson down payment for a house.  And he even found a house

13   for me.  He looked it up in New York where -- in my grandson's

14   area, and he told me how much the house was going to cost.  And

15   in case they asked, he gave me all that information.

16   Q.    Did Mr. Bedoya ever say what would happen to you or suggest

17   what would happen to you if you did not follow his instructions,

18   if you did not make these --

19   A.    Right.

20   Q.    -- financial transactions?

21   A.    Well, he said -- he kind of like, in a way, threatened a

22   little.  And he'd say, you know, you can't do that, and he used

23   a certain word that I can't think of right this second.  He used

24   a certain word with me.  Like that there would be --

25   consequences.  There would be consequences.

FAGELBAUM - DIRECT

1  Q.   That was his exact words:  There will be consequences?

2  A.   Yes, yes.  He said it, you know, in a nice way, not saying

3  we're going to kill you or we're going to do this or that.  He

4  said there will be consequences if you don't do this.

5        And then he also said, Well, we're going to have to

6  look up your whole family, and we don't want -- they didn't want

7  me to tell anybody.  I had to sign.  He sent me a paper to sign

8  the agreement that I wouldn't tell anybody about this.

9  Q.   And you didn't, did you?

10  A.   In my family.  And I never did.

11  Q.   So no one in your family was able to help you through

12  this --

13  A.   No.

14  Q.   -- at that time?

15  A.   They tried.  They did try, and I didn't listen because it

16  was so real to me that I was -- I didn't want to start, that

17  they would get in the middle of this, and I didn't -- I just

18  didn't want to do that, get them involved.

19  Q.   Well, you believed he was working for the Federal Trade

20  Commission, right?

21  A.   Yeah, that's what he said.

22  Q.   So tell me about --

23  A.   And he also sent me papers from the Federal Trade

24  Commission.  And it was all phony papers.

25  Q.   But you didn't know that at the time?

FAGELBAUM - DIRECT

1   A.   No.

2   Q.   So you talked -- you told us about how you moved this money

3   around in your accounts to make these purchases.  Now tell us

4   about the purchases or the transfers of money that you made.

5   A.   Well, what do you mean, how?

6   Q.   Well, first of all, did you do this more than once?

7   A.   Oh, it was about ten times.

8   Q.   Okay.  So let's start with the beginning.  What did you do

9   for the first time you turned over money?

10   A.   Well, I had to -- as far as turning it over, some -- he

11   told me that -- first of all, he had me take pictures of my car,

12   the front of my car, and me, to see what I was wearing and what

13   I looked like.  And so I had sent him that picture, all on

14   Signal.

15   Q.   I'm sorry, the front of your what?

16   A.   I sent him on Signal.

17   Q.   But you said you took a picture of the front of something?

18   A.   My car.  My car, that I had to go --

19   Q.   Card or car?

20   A.   Car, C-A-R.

21   Q.   Oh, okay.  So he wanted to see what vehicle you were

22   driving.

23   A.   Right, my vehicle.

24   Q.   Okay.

25   A.   I had to meet the person that was going -- I was going to

FAGELBAUM - DIRECT

```
1    give them the money, the gold.  And I had to take pictures of --
2    as I counted all the -- get a carton and count all the gold and
3    show him each piece counted for, was 30, if it was 50, 60 -- I
4    had to count it all out with a video and -- so he could see it.
5    Q.   Okay.  So let me just clarify something.
6             So these ten different times you transferred money,
7    was it always gold or was there sometimes cash?
8    A.   Sometimes cash.
9    Q.   Okay.  But --
10   A.   But mostly it was gold.
11   Q.   Okay.  So starting with the -- what was the very first
12   transaction?  Was that cash or gold or both, if you recall?
13   A.   I don't really recall if it was both or not.  It was
14   definitely gold because it was always gold.
15   Q.   There was -- okay.  So of all of these --
16   A.   There may have been one or two times that there was some
17   cash, but I really don't remember exactly the first time.  It
18   was, you know, a long time ago.
19   Q.   Understood.  Okay.  So -- and then so all of them involved
20   gold, and then maybe one or two of them also involved cash; is
21   that correct?
22   A.   Yeah, right.
23   Q.   So these -- the gold, did you have that already in your
24   possession, or you had to purchase it?
25   A.   I had to purchase it.
```

FAGELBAUM - DIRECT

1    Q.    Each time?

2    A.    Yeah.  I went to the gold dealer.  He told me who to use.

3    There were two different people.

4    Q.    He being Mr. Bedoya told you that?

5    A.    Yes, two different businesses --

6    Q.    Mr. Bedoya --

7    A.    -- that would sell gold, you know, where I could purchase

8    it.  And I guess he thought that maybe after a while, I was

9    using one person for several times, that I should use somebody

10   else.  They shouldn't get suspicious.  That's what I'm thinking

11   now.

12   Q.    Okay.  So Mr. Bedoya told you to go to two different

13   locations over the course of the multiple transactions to

14   purchase gold, right?

15   A.    Right.

16   Q.    And then we talked about how you paid for the gold through

17   the wire transfers?

18   A.    Right.

19   Q.    What would you do with the gold after you picked it up?

20   A.    I picked it up -- he would be on the phone.  He would call

21   me and say, I'm going to be on the phone and make sure you're

22   okay.  And he had held on.  I think now that he may have done it

23   because he didn't want me to make any phone calls, you know, to

24   anybody else.  So he held me on the phone the whole ride that I

25   went to get the gold.

FAGELBAUM - DIRECT

1   Q.   To purchase it.

2   A.   First I had to purchase it, right.  Right, that I had to

3   purchase it.  And one time the man took a check from me after I

4   had purchased a few times.  He knew me, so he accepted a check,

5   but usually it was the wire.

6   Q.   Okay.  So after you purchased the gold, what did you do

7   with it?

8   A.   I brought it home.  And he stayed on the phone the whole

9   time that I was in the car going home, and I had to get the

10  carton and put it in as I said before, put it in the box.

11  Q.   Right.

12  A.   In the carton, and he would -- and film it.  I took a video

13  so he would see that I'm counting it, that it's what should be

14  there.

15  Q.   The correct amount?

16  A.   Right, the correct amount.

17  Q.   Then did you have to send that video to Mr. Bedoya?

18  A.   Yeah.

19  Q.   Okay.

20  A.   Right.  And then it could have been a day or two or

21  sometime -- maybe three days later, he would have somebody I

22  would have to meet, and he would tell me where to go, where --

23  which there was Walmart, there was a school near me, a

24  Montessori school.  It was on the street outside of my home.  It

25  was Burger King.  There were different places that he told me to

FAGELBAUM - DIRECT

1    meet somebody.  Target parking lot and --

2    Q.   Well --

3    A.   I remember the Burger King, that when I parked my car, I

4    was facing Glades Road, which is the main street over in there.

5    Because you could park different areas, and I parked -- I pulled

6    in there, and then the car pulled next to me.

7         And they always had to have a password.  So he would

8    tell me the password to use that the person that was getting the

9    gold, picking it up, would have to tell me the password.

10   Q.   So --

11   A.   And I would know that it's right.

12   Q.   But to be clear, are you saying that when you were told to

13   go to these various commercial establishments, parking lots like

14   Walmart --

15   A.   Right.

16   Q.   -- Target, and Burger King, you were then expected to meet

17   somebody to hand them over the gold; is that right?

18   A.   Right.

19   Q.   Okay.  What was your interaction like with the -- just in

20   general, since you did these ten times, what was it like in

21   general?

22   A.   With the person that picked me up?

23   Q.   With the person that picked up the gold from you.

24   A.   Picked up the gold.  That's what I meant.

25        I didn't -- I didn't have conversation with them.

1    Q.    Okay.

2    A.    It was just that he would say the password, and I would

3    say, you know, okay, and they always opened up the back window.

4    Like if he was sitting on the left side, I would be on the right

5    side, and he would open the back window, and I would drop the

6    carton in the -- on the back seat.

7    Q.    Okay.

8    A.    And then goodbye, you know, just -- I didn't -- I didn't --

9    I mean, I've seen them talk on the phone.  They were talking to

10   someone.  Had he me -- Bedoya, he had me holding on the whole

11   time with him.

12   Q.    So you were on the phone with Mr. Bedoya at the time that

13   the -- at the time that you were transferring the gold to the

14   people in these commercial parking lots?

15   A.    Right.

16   Q.    And you said you could also see that the drivers were

17   sometimes on the phone at that time as well?

18   A.    Yes.  They would be sitting next to me talking on the phone

19   until there was maybe -- I don't know what they can see.  Like

20   maybe a couple of minutes.

21   Q.    Do you recall any of the vehicles that came that -- of the

22   drivers that came to pick up gold from you?

23   A.    They were always different vehicles, different -- the

24   color:  white, black, gray.  Sometimes there was -- what are

25   they called, like a pickup -- kind of a pickup truck.  You know,

FAGELBAUM - DIRECT

1  one had a pickup truck.  But they were always different.

2  Q.   Did you see the drivers even though you were dropping it

3  off --

4  A.   Yes.

5  Q.   -- in the back window?

6  A.   Yes, I could see the drivers.  They were all kind of --

7  built kind of the same:  slim, not, you know, heavy.  They

8  were all kind of slim.  They were a little like, I don't know,

9  Spanish-looking.  You know, they -- I don't -- I couldn't say

10  exactly what they looked like because it was so quick.

11  Q.   That's okay.

12  A.   You know, and it was just -- they just said the password.

13  Q.   You said one of the vehicles was the color black, correct?

14  A.   Yeah.

15  Q.   Do you recall what type of vehicle that was, the -- that,

16  specifically referring to the black one?

17  A.   You know, I'm really not that good with cars, recognizing

18  cars.  I just see a color, and I don't pay attention.

19  Q.   Did you get any type of receipt or documentation from the

20  drivers after you put in the --

21  A.   No.

22  Q.   -- the package?

23  A.   No, they didn't give anything.

24  Q.   And what did you think was going to happen with the package

25  of gold after you put it in the car?

1    A.    Well, it was supposed to be going to the Treasury

2    Department.  It was going to a judge he told me.

3    Q.    A judge?

4    A.    A judge, yeah.  And the judge would okay it, and they would

5    send it to the Treasury Department.

6    Q.    Were you promised that the gold would be returned to you at

7    some point?

8    A.    Yeah, when my ID was changed.  Yes, that's what he said.

9    Q.    Was it ever -- of all the ten times that you did this, did

10   you ever get any of that gold or the value of the gold back?

11   A.    No.  Are you kidding?  I lost everything.

12   Q.    Do you believe the individual that you were speaking with

13   on the phone, Mr. Bedoya, was truly working for the FTC, the

14   Federal Trade Commission?

15   A.    I did because there was no reason for me not to.  He didn't

16   call me.  I called there.  I called Chase.  I just assumed they

17   connected me to whoever they had to.

18   Q.    If he was not working for the FTC, would you have done

19   these transfers of gold in that way?

20   A.    No.  If I -- no.  If he called me?  Never.  I would have

21   just hung up.

22   Q.    How did these transactions stop for you?  Why wasn't there

23   an 11th?

24   A.    Well, it reached a point that the money was all gone

25   already, and in -- it was in December.  He told me that

1    somebody's going to come -- oh, he's going to get me tickets to

2    go to New York, because I told him I didn't -- he said two men

3    are going to come to my house, and they're going to give me my

4    new ID and whatever they had to do.

5            So I said, I don't want to be alone here in my house.

6    At that point, my daughter lived in New York and my son.  And I

7    said I don't want, you know, to be alone.  So I said I want to

8    go up to New York and be with my son and my daughter when they

9    come.  And he said, oh, okay.  I will get you tickets.  Don't

10   worry about it.  And --

11   Q.   Why did he need to get you tickets?

12   A.   Because I was in Boca.  I'm in Florida, and I wanted to go

13   up to New York.  I didn't want these two people coming to my

14   house, you know, when I was alone.

15   Q.   Well, what I mean is why couldn't you purchase the tickets

16   yourself?

17   A.   Well, he was -- they were paying.  The government --

18   Q.   Okay.

19   A.   -- was supposedly paying for my ticket --

20   Q.   Got it.

21   A.   -- to go, you know, because this was all that I was -- like

22   helping the government.

23   Q.   Understood.

24   A.   So he -- I called him -- I was supposed to go fly up on a

25   Monday morning, Monday.  And that couple of days, few days

FAGELBAUM - DIRECT

1  before, I didn't hear from him, and it wasn't like him.  He

2  called me practically every day, except Sunday he didn't call.

3  Even some Saturdays he called me, but not all.

4          But during the week, he called me every day.  And I

5  didn't hear from him, and I didn't -- I called the airline, and

6  I said, Do you have any reservation for me, my name, and they

7  said no, there isn't anything.  So that's when we started -- I

8  started -- and I must have mentioned to my son and daughter,

9  both of them at that time, that something's not right.  Because

10 they thought it was wrong, but I was -- he had me so, you know,

11 believing him that I just went along with it, stupidly.

12 Q.   After that, did you have any conversations with Mr. Bedoya

13 again?

14 A.   I called him, and he finally called me back, which he

15 didn't call me back right away.  And then there were a couple

16 of -- like I tried to call him, I texted him.  He didn't answer,

17 this and that.  And then it was really the last phone call, I --

18 he called.  Craig and Bonnie, my son and daughter, came down.

19 They flew down right away to me, and they were in the house with

20 me.  He called me.

21          Now, Craig was standing next to me, and I motioned to

22 Craig that he's on the phone.  So Craig quickly called the

23 sheriff's department, and what they said to him I thought was

24 terrible, but they said to him, Oh, tell her to hang up right

25 away.  But, okay, and I -- then I hung up.

FAGELBAUM - DIRECT

1              But before I hung up and while he was calling them, he
2     said to me, I know that you made a call that you weren't
3     supposed to.  So I said, I don't know what you mean.  I make a
4     lot of -- he said today.  I said I make a lot of calls in the
5     day.  I don't know what you mean.  So he said there will be
6     consequences.
7              And then I hung up because the sheriff told Craig to
8     tell me to hang up, which I don't think they should've.  I
9     should've made another meeting with him and had the police go,
10    and they could have caught that person.  But that's what --
11    that's what they did.
12    Q.   All right.  So that's how -- that's how the conversation
13    stopped with you and --
14    A.   Right.
15    Q.   -- Mr. Bedoya?
16    A.   That time, yeah.  And then -- yeah, he kept calling at that
17    time, calling me back, but I didn't answer.
18    Q.   As a result of the conversations you had with Mr. Bedoya
19    and his directions to you, approximately how much money did you
20    spend to purchase gold that you later transferred in this
21    manner?
22    A.   It was about 17 -- a million seven and plus all of the
23    interest, all of the -- when I had to give, give up whatever it
24    was.  Even the stocks, I had good stocks.  I lost that money.
25    You know, there was -- it was the future also.  I lost -- I lost

FAGELBAUM - DIRECT

1    everything.

2    Q.    I'm sorry.

3    A.    My daughter had to move down.  She sold her house in New

4    York, moved down here with me, living with me to help -- that

5    she'll pay the bills with -- my expenses.  I went from being

6    comfortable to nothing.  So she had to give up her life and stay

7    with me to help me pay.

8    Q.    I want to switch gears a little bit, Ms. Fagelbaum.

9            Can we show the witness Exhibit 33, please.

10           Ma'am, you can -- you're the only one that can see

11   this on your screen right now.  The jury can't see it.  So can

12   you generally describe what we're looking at?

13   A.    Well, that was, I think -- 12-5 it's dated.  That was maybe

14   the last one, next to the last.  I don't remember exactly.  But

15   it's 32 ounces of gold bars, and it was 2710 each bar, $2,710.

16   And it was -- the total was $86,720, and that's what I gave to

17   the gold -- the gold people.  They got me -- you know, after

18   getting the money, they got the gold for me.

19   Q.    Ma'am, is --

20   A.    And that was -- that was given to him.

21   Q.    Right.

22   A.    That one, yeah.  That's one particular one.

23   Q.    Is Exhibit 33, the document on your screen, an invoice that

24   you received from the Coin & Jewelry Gallery of Boca Raton?

25   A.    This, you mean?

FAGELBAUM - DIRECT

1    Q.    Yes, ma'am.

2    A.    Yes.

3    Q.    Okay.  Is this the invoice you received for one of the

4    purchases of gold you made for one of the transactions we

5    discussed previously?

6    A.    Right.

7    Q.    Is this a fair and accurate depiction of an invoice you

8    received for that particular --

9    A.    Yeah.

10    Q.    Okay.  Thank you.

11          MR. HAPNER:  I would move to admit Government

12    Exhibit 33 in evidence.

13          MS. CONTRERAS:  No objection, Your Honor.

14          THE COURT:  All right.  33's admitted.

15      (GOVERNMENT EXHIBIT 33:  Received in evidence.)

16    BY MR. HAPNER:

17    Q.    All right.  Not to be repetitive, but now that the jury can

18    see what the document is, can you explain what you were saying

19    earlier about the amount you purchased?

20    A.    Okay.  Yeah, it was dated 12-5, December.  That was like

21    going down toward the end.  12-5-24.  The quantity, 32 ounces.

22    That each one is 1 ounce, so it was 32 bars.  One ounce of gold

23    bars, each one was worth 2710, $2,710, and the total of 32 times

24    2710 was $86,720.

25    Q.    Thank you.

1   A.   That was one of many.

2   Q.   Thank you.  And did you make this purchase on the date it

3   has up there, December 5th, 2024?

4   A.   Yes.

5   Q.   Did you also pick up the gold on that same day, or was

6   there a delay?

7   A.   Yes, because this was when he gave me the gold, yes.

8   Q.   And you mentioned earlier that this was one of the latter,

9   more recent transactions that you did, correct?

10  A.   Yes.

11          MR. HAPNER:  Okay.  Can we see Exhibit 34, please for

12  the witness.

13  BY MR. HAPNER:

14  Q.   Can you see that on your screen, ma'am?

15  A.   Yes.

16  Q.   What is this document?

17  A.   From Bank of America, my bank.  Deposits and withdrawals.

18  Q.   Is this a copy of your statement from your Bank of America

19  account?

20  A.   Yes.

21  Q.   And does this particular page of the statement reflect the

22  transfer of money you made to purchase the gold we just saw in

23  Exhibit 33?

24  A.   There was -- I withdrew, okay, 10,000, then 13,000.  And

25  the wire was -- there was a wire sent, and the wire was sent on

FAGELBAUM - DIRECT

1   the 14th of -- excuse me, on the 4th, December 4th, the day

2   before that other receipt.

3   Q.   Yes, ma'am.  I'm just trying to --

4   A.   And that was 86,720.

5   Q.   Right.  And is that the same amount of the --

6   A.   Yes.

7   Q.   -- gold that you purchased in Exhibit 33?

8   A.   Right.

9   Q.   So is this document a fair and accurate depiction of your

10  bank account statement for that transaction?

11  A.   Yes.

12           MR. HAPNER:  I would move to admit Exhibit 34 into

13  evidence.

14           THE COURT:  Any objection?

15           MS. CONTRERAS:  No objection, Your Honor.

16           THE COURT:  34's admitted.

17     (GOVERNMENT EXHIBIT 34:  Received in evidence.)

18           MR. HAPNER:  Okay.  If we could highlight the one

19  transaction, please, for the jury.

20  BY MR. HAPNER:

21  Q.   And you just explained it, ma'am, but if you could point

22  this out.

23  A.   Okay.

24  Q.   There's a -- I'll help I.

25           So on December 4, 2024, there was a wire out, and that

1    was for the amount of 86,720, correct?

2    A.    Right.

3    Q.    And this was from your Bank of America account?

4    A.    Yes.

5    Q.    Thank you.

6            Now, I want to look at Exhibit 14-1 from the

7    defendant's phone, and specifically page 693, please.

8            Okay.  Ma'am, can you see this on your screen?

9    A.    Yes.

10   Q.    You see how there's a blue box, and then in that box

11   there's an address of ▮▮▮▮▮▮▮▮▮▮ Drive, Boca Raton, FL,

12   33498?

13   A.    Yes.

14   Q.    Do you recognize that address?

15   A.    Yeah, that's where I live.

16   Q.    Is that where you were when you made a transfer of gold

17   from -- that you had previously purchased from the Coin &

18   Jewelry Gallery?

19   A.    Yeah.

20   Q.    And did that transaction occur on -- let me rephrase that.

21           When you transferred the gold to the person in the

22   parking lot, did that occur on December 6, 2024?

23           As a reminder --

24   A.    Yeah.

25   Q.    -- the Coin & Jewelry invoice was dated December 5th.

FAGELBAUM - DIRECT

1    A.    It was about the 6th, yeah, because the receipt was the

2    5th.

3    Q.    Correct.

4    A.    Right.  And that was the 6th, the day after.

5    Q.    So did these transactions usually take place the same day

6    or the day after you picked up the gold?

7    A.    Not usually the same day.  Usually, it could be the day

8    after.  It could have been two days after.

9    Q.    Okay.

10   A.    You know, sometimes he'd say, Oh, the person picking up the

11   money, he had trouble with his automobile, so it will be

12   tomorrow.  You know, there was once in a while, but usually it

13   was the next day.

14   Q.    Got it.

15         Can we please turn to page 713.  Right there.

16         There's another blue box, and this one says Burger

17   King, 8175 Glades Road, Boca Raton, Florida, 33434?

18   A.    Right.

19   Q.    Do you recognize that address?

20   A.    Yes.

21   Q.    How do you recognize it?

22   A.    I went there.  That was the pickup for that date, for the

23   5th, 6th, for that 86,000 plus.  I went to Burger King, yes.

24   That was my meeting place.  It was on Glades Road right near the

25   turnpike, Florida turnpike.

1    Q.   That's where Mr. Bedoya told you to go to transfer the

2    package of gold?

3    A.   Yes.

4    Q.   Can we turn to page 717, please.

5             This is still from the same day.  Right there,

6    December 6, 2024.  There's a reference to a white Mercedes.  Do

7    you see that?

8    A.   Yes.

9    Q.   What type of vehicle did you drive to Burger King that day?

10   A.   A white Mercedes.

11   Q.   Did you communicate to Mr. Bedoya what type of vehicle you

12   had?  I think you mentioned that earlier.

13   A.   Yeah, he -- I had to always send him a picture of the

14   front, the license.  You know, the front of the car and myself.

15   Q.   Can we turn to page 721, please.

16            And there's a photo on this page.  We're going to blow

17   it up for you.

18   A.   Yeah.

19   Q.   Do you recognize what is in this photo?

20   A.   Yeah.  That's all the gold and cash.

21   Q.   So this is one of the transactions where you turned over

22   both gold and cash?

23   A.   Probably, yeah.

24   Q.   You specifically remember the gold the way it was packaged?

25   A.   Yeah, that's how it comes, in those orange little packets,

FAGELBAUM - DIRECT

1    and then it's put in a little carton.

2    Q.   Okay.  If we could back out.

3            That photo was sent, ma'am, at 1:56 p.m.  Is that

4    consistent with the time that you met this individual in the

5    Burger King parking lot?

6    A.   Yeah.

7    Q.   Do you have a specific recollection of what happened that

8    day that you can tell us exactly how that transaction unfolded,

9    as opposed to the other ones?

10   A.   It was the same.  He held me on the phone, and the other

11   person, the pickup guy, was talking on his phone.  And I waited

12   a little bit, and then he said to me, Okay, go out -- get out of

13   the car, hold the package, and put it in the back window.  But I

14   had to get the password from him, and he gave the password.

15   Q.   Anything else you specifically recall about the one

16   transaction you did in the Burger King on December -- in the

17   Burger King parking lot?

18   A.   I just -- I remember that I was facing Glades Road.

19   Q.   Okay.

20   A.   The main street, you know, you can park in different

21   places, but I was facing Glades.  I pulled into a parking spot.

22           MR. HAPNER:  One moment.

23           No further questions.

24           THE COURT:  Thank you.

25           Ms. Contreras.

**CROSS-EXAMINATION**

BY MS. CONTRERAS:

Q.   Good afternoon, Ms. Fagelbaum.

        You testified during direct that you met with people
in parking lots to hand over the gold or cash, correct?

A.   Yes.  Well, a couple of times it wasn't in a parking lot.
It was on the street outside -- I live in a gated community, and
it was on the road that leads into the gate.  And then twice, I
think it was, I met them.  As you come toward the gate, there's
a pathway for the cars to go, and I met -- two times I remember
I met them there.

Q.   And you testified you did this about a total of ten times;
is that correct?

A.   Yeah.

Q.   So about, let's say, seven or eight times, it was that a
parking lot?

A.   Yeah.

Q.   When you were handing over the packages, the whole time you
were on the phone with someone else?

A.   Yes.

Q.   Every time?

A.   Yeah.

Q.   You testified that it was always different vehicles.  Was
it always different drivers?

A.   They seemed -- there were times that it was different, I

1   can just see they looked different.

2   Q.   It was ever the same person twice?

3   A.   I'm not sure of that.

4   Q.   You mentioned the name of someone who was telling you lies,

5   Alberto Bedoya, correct?

6   A.   Alvaro.

7   Q.   Alvaro.  Are there any other names that you have of someone

8   that may have been involved in this scam?

9   A.   No, he didn't give names, just it was him.  I spoke only to

10  him.

11  Q.   Okay.  So nobody else called you?

12  A.   No.

13          MS. CONTRERAS:  No further questions, Your Honor.

14          MR. HAPNER:  No redirect.

15          THE COURT:  Okay.  Thank you, ma'am.  You can step

16  down.

17          THE WITNESS:  Oh, okay.  Thank you.

18      *(Excerpt end.)*

19                      * * * * * * * *

20      I hereby certify that the foregoing is a true and correct
    transcript of the stenographically reported proceedings held in
21  the above-entitled matter, pursuant to the provisions of Section
    753, Title 28, United States Code.

22

23  *Julie A. Wycoff*                        10/8/25

24  _____    _____
    Julie A. Wycoff, RMR, CRR           Date
    Official U.S. Court Reporter

25

1              **I N D E X**

2   Government Witnesses

3   MAXINE FAGELBAUM

4           Direct Examination by Mr. Hapner ....................2

5           Cross-Examination by Ms. Contreras .................30

6

7

8                       **GOVERNMENT EXHIBITS**

9   Exhibit    Description                        Marked  Admitted

10  33         Receipt from Coin & Jewelry Gallery    23      23

11  34         Bank of America statement              25      25

12

13

14

15

16

17

18

19

20

21

22

23

24

25