1            **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF FLORIDA**
2              **GAINESVILLE DIVISION**

3

UNITED STATES OF AMERICA,    )
4                         )
              Plaintiff,   ) Case No: 1:25-CR-12-AW
5                         )
     v.            ) Gainesville, Florida
6                       ) October 2, 2025
                     )
7  ATHARVA SATHAWANE a/k/a   )
  "Andy Sathawane,"     )
8                       ) 11:49 a.m.
             Defendant.   )
9  _____)

10

          EXCERPT OF JURY TRIAL TRANSCRIPT
11          TESTIMONY OF **ATHARVA SATHAWANE**
      BEFORE THE HONORABLE ALLEN C. WINSOR
12          UNITED STATES DISTRICT JUDGE
          (Pages 1 through 148)
13

14 <u>APPEARANCES:</u>

15

For the Government:     United States Attorney's Office
16                    by:  **ADAM M. HAPNER**
                   300 E. University Avenue
17                    Suite 310
                   Gainesville, Florida 32601
18                    (352) 378-0996
                   *adam.hapner@usdoj.gov*
19

20 For the Defendant:      Smith & Eulo
                   by:  **ALEJANDRA CONTRERAS CABALLERO**
21                    2720 NW 6th Street
                   Suite 302C
22                    Gainesville, Florida 32609
                   (585) 576-7255
23                    *alex.c.macias.89@gmail.com*

24

          *Julie A. Wycoff, RMR, CRR*
25        *Official United States Court Reporter*
      *(850) 470-8196 * julieawycoff@gmail.com*

1          **P R O C E E D I N G S**

2          *(Begin excerpt.)*

3               MS. CONTRERAS:  Your Honor, the defense calls the

4     defendant, Mr. Atharva Sathawane.

5          **ATHARVA SATHAWANE, DEFENSE WITNESS, DULY SWORN**

6               DEPUTY CLERK:  Be seated, please.

7               For the record, please state your name and spell your

8     last name.

9               THE WITNESS:  Atharva Sathawane.  It's

10    S-A-T-H-A-W-A-N-E.

11              DEPUTY CLERK:  Thank you.

12                    **DIRECT EXAMINATION**

13    BY MS. CONTRERAS:

14    Q.   Good afternoon, Mr. Sathawane.

15    A.   Good afternoon.

16    Q.   Mr. Sathawane, you've been sitting in this courtroom for

17    four days; is that --

18    A.   Yes.

19    Q.   What was your role in this case?

20    A.   I was a driver picking up packages from point A to point B.

21    Q.   Who were you picking up the packages from?

22    A.   I was picking up packages from mostly random people.

23    Q.   When you picked up the packages, what was the demeanor of

24    the people giving you the packages?

25    A.   The people seemed calm.  They were always willing or

SATHAWANE - DIRECT

1    waiting for me to show up to the driveway to give the packages.

2    Q.    Sorry.  Your accent's a little hard to understand.  They

3    were always -- what was the word that you said?

4    A.    They were calm.  They were like -- they were calm.  They

5    were waiting for me.

6    Q.    Did they ever seem upset or agitated?

7    A.    No, they did not seem agitated or upset.  They looked

8    willing, and they looked like they wanted to give me the

9    packages.

10   Q.    Did you ever have any conversations with them?

11   A.    No.  Mostly they were busy on their phones, and I never got

12   a word out with them.

13   Q.    So you were working -- were you working for someone?

14   A.    Yes.

15   Q.    Who was -- what were the names of the people you were

16   working for?

17   A.    They were Bond, Alex, and Sergio.

18   Q.    Do you know if that's the real name of those people?

19   A.    No, I cannot confirm.

20   Q.    Do you have any idea what Sergio's real name is?

21   A.    I believe Sergio and Alex were the same person.

22   Q.    Okay.

23   A.    And I think his name was Bratham Shah -- that's

24   B-R-A-T-H-A-M, S-H-A-H -- but I cannot be a hundred percent

25   sure.

SATHAWANE - DIRECT

1  Q.   How about Bond?  Any idea what his real name is?

2  A.   No, I have not idea.

3  Q.   Did you ever meet Sergio in person?

4  A.   No.

5  Q.   Did you ever meet -- and you said you believe Sergio and

6  Alex are the same person?

7  A.   That's correct.

8  Q.   Did you ever meet Bond in person?

9  A.   No.

10 Q.   Did you ever video chat with any of them?

11 A.   Yes, I did, but the camera was always switched off, so I

12 never got to see them.

13 Q.   Would you be able to describe any of them?

14 A.   No.

15 Q.   Did you ever ask any of them the purpose of the job?

16 A.   At the start, after a couple runs, I did ask them what was

17 happening; and they told me that they were just the logistics

18 part, so they don't know.

19 Q.   Was that the only time you asked them?

20 A.   No.  I actually asked them a couple more times later while

21 proceeding with the...

22 Q.   What did they say?

23 A.   The next time that I asked them, I was actually in New

24 Jersey.  I been waiting there for four days to actually do

25 something, and I said, Hey, what is this about?  Why is there

SATHAWANE - DIRECT

1    nothing?  Why did you bring me here?  And the answer I got from

2    them was it's just people buying and selling gold off of the

3    market, so it's just about that.

4    Q.    What did that mean to you, off the market?

5    A.    From what I understood from that was it's just people

6    trying to evade taxes trying to sell off their gold or buy gold

7    and not pay taxes.  So I just thought that that was happening.

8    Q.    Did you believe them?

9    A.    I did believe them because 60, 70 percent of the time, I

10   delivered off to Bliss Jewelry store, and I actually know that

11   was a jewelry store because I went in a couple occasions, and

12   then the guy always came out of the store.

13          The guy in Manhattan, New York, he came out of his

14   jewelry store as well, and then there was a third person, Steve.

15   He also was working with jewelers.  He always had his backpack

16   with gold and cash.  And there was another person, they were

17   related with jewelers as well, because they also did mention

18   that they have a shop around.

19   Q.    Again with your accent, are you saying the word "jewelers"?

20   A.    Yep.

21          MS. CONTRERAS:  Okay.  If possible, would you kindly

22   mind pulling up Government Exhibit 28.  I believe that should be

23   the summary of transactions.

24          And thank you so much.

25          MR. HAPNER:  Flowcharts?

SATHAWANE - DIRECT

1          MS. CONTRERAS:  Yeah, flowcharts.

2          MR. HAPNER:  Exhibit 58.

3          MS. CONTRERAS:  58, sorry.  Thank you.

4          If you could blow up that.  And we're hoping to go

5    through each transaction, if you could.  I can -- I don't know

6    if there's any way for me to help you, but thank you so much.

7    BY MS. CONTRERAS:

8    Q.    Okay, Mr. Sathawane.  The Government provided this chart of

9    the transactions they connected with you.  Right?

10   A.    Yes.

11   Q.    This first transaction, do you know who it went to?

12   A.    This went to Steve.

13   Q.    And who is Steve again?

14   A.    Steve was a jeweler as well, and he came to pick it off,

15   pick the package up from me.

16   Q.    How did you know he was a jeweler?

17   A.    When I saw him in person, he had a backpack full of gold

18   and cash, and he actually took the items and put it in his bag.

19   And I asked him, Hey, how -- like what you doing?  And he said,

20   Oh, I'm a jeweler too, so I'm just picking up my packages right

21   now.

22   Q.    Do you have any idea where Steve worked?

23   A.    I believe he worked in Orlando, in one of the shops in

24   Orlando.

25   Q.    Any idea what shop that was?

SATHAWANE - DIRECT

1    A.    I didn't ask.

2              MS. CONTRERAS:    Okay.    May have I have the next one.

3    BY MS. CONTRERAS:

4    Q.    Do you know where you dropped this?

5    A.    This one went to the jeweler Bliss Jewelry store.

6    Q.    What's Bliss Jewelry?

7    A.    That is a store out in Clearwater, if I'm not wrong.    And

8    there's a picture in this flowchart that actually shows the

9    picture of the store.

10   Q.    Later, right?

11   A.    Yeah.

12   Q.    Okay.    And how did you know this went to Bliss?

13   A.    I remember this one because this one was my first

14   interaction with him.

15   Q.    With who?

16   A.    With the Bliss jewel owner, the guy from the store.    He was

17   also the owner, from what I believe, and that's how I remember

18   it.

19   Q.    Do you know his name?

20   A.    No.

21   Q.    Can you describe him?

22   A.    He's a Indian guy, maybe 5'6" in height, 130 pounds.    He's

23   always -- he's skinny, always clean-shaven, has medium hair,

24   dark hair.

25   Q.    I'm sorry.    Again, how are you connecting him to Bliss

SATHAWANE - DIRECT

1   jewelers?

2   A.   So at this day, he told me he owned a jewelry store, but

3   in -- I think the next one, or the one after this one, I

4   actually went to the store, and he came out.

5           MS. CONTRERAS:  Can we go to -- okay.

6   BY MS. CONTRERAS:

7   Q.   Well, what about this one?  Do you remember where you

8   dropped here?

9   A.   If you can go to the next one, that's when I see.  It

10  doesn't show it right now.

11          THE COURT:  This is 4A that's up.

12          MS. CONTRERAS:  Right.  This is still Government

13  Exhibit 58, page 4.

14  BY MS. CONTRERAS:

15  Q.   Let's -- I know we'll get to what you're talking about

16  later, but do you remember where --

17  A.   So this one was actually a family member of Bond.  The guy

18  came outside, and the plaza that I'm in right now has a jewelry

19  store right behind it too.  So he just came, walked out of the

20  store to me.

21  Q.   Okay.  Why did you think it was a family member?

22  A.   That's what they said in the conversation.

23  Q.   In the conversation, okay.

24          Could we about to the next one, please.

25          Do you remember anything about where you dropped here?

SATHAWANE - DIRECT

1   A.   So this one was actually -- they ask me to send this guy,

2   Dhruv, $3,200 letting me know that he was in an ER.

3   Q.   In what?  Sorry.

4   A.   In the emergency response in the hospital, and he needed

5   the money.  So they had me send him the money and take it out of

6   the remaining money that I had with me.

7   Q.   And so are you saying this time you picked up cash?

8   A.   That is correct.

9   Q.   Do you know where you dropped it?

10  A.   Half of it went to the Bliss jeweler, and the next one I

11  think we believe you see it in the next slide.

12  Q.   Okay.

13  A.   This is in New York.

14  Q.   This is in New York, okay, but back before you said half of

15  it went to Bliss --

16  A.   Yeah.

17  Q.   -- and the other half where?

18  A.   To the guy, the other jeweler, who came out of the store.

19  Q.   The one you described earlier?

20  A.   The family member.

21  Q.   Is that the same guy you described earlier, the skinny guy?

22  A.   No, that's at Bliss jeweler.

23       MS. CONTRERAS:  Okay.  So let's -- can we go back

24  to 4?  Sorry.

25  ///

SATHAWANE - DIRECT

1  BY MS. CONTRERAS:

2  Q.   Okay.  Let's go back to four.  I asked you where you

3  dropped this.

4  A.   I'm sorry.  I didn't see the right part of it.

5  Q.   So again, where did you drop this cash?

6  A.   This one was actually picked up from my house itself.  You

7  can see the address.  And I believe this guy was the same guy

8  that picked up the first one, the one from 4A.  It was the same

9  guy who actually came to my house to pick it up, the next day

10  though.

11  Q.   Is that the same guy you described earlier?

12  A.   No.

13  Q.   This is a different person?

14  A.   Yep.

15  Q.   Okay.  Do you know their name?

16  A.   No.

17  Q.   Can you describe them?

18  A.   Again, an Indian person, a little on the heavier side.

19  Q.   Heavier side.  Okay.

20  A.   He was almost as tall as I am, so 5'10", 5'9" in height,

21  and darker skin, darker than me.  That's all I can remember

22  right now.

23  Q.   Okay.  But you said you thought this was also a jeweler?

24  A.   Yeah, he walked out of a jewelry store.

25  Q.   Is that -- was that the only reason you thought that?

```
1    A.    Yeah.

2    Q.    Okay.

3              Now, can we go to the next one?  Thank you.

4              Okay.  You just said earlier this was in New York?

5    A.    That is correct.

6    Q.    And where did you drop here?

7    A.    This was Diamond District.  This was in New York Diamond

8    District in one of the jewelry stores right there.  The guy

9    actually came out, locking his store, came to me, took the

10   package, gave me the money, and then go away.

11   Q.    Okay.  Could we go to the next one, please.

12             Where did you drop in this one, if you remember?

13   A.    I'm actually at the housing area right there, and I don't

14   know if this guy was a jeweler because he walked out of his

15   apartment.

16   Q.    Okay.

17   A.    He just came down and pick it up.

18             MS. CONTRERAS:  Can we go to the next one?

19   BY MS. CONTRERAS:

20   Q.    Do you remember --

21   A.    So this is the same guy from the Diamond District, and he

22   met me at a Chase Bank closer to his house.  That's why you see

23   the Chase here.

24   Q.    Sorry.  The Diamond District in New York?

25   A.    Yeah.
```

SATHAWANE - DIRECT

1   Q.   So where -- this was in New Jersey?

2   A.   This was in New Jersey.

3   Q.   Okay.  So it was the same guy that came out of the jewelry

4   store?

5   A.   Yep.

6          MS. CONTRERAS:  Can we go to the next one, please.

7   BY MS. CONTRERAS:

8   Q.   What about this one?

9   A.   This is the same one.  This is the parking lot of the Chase

10  Bank that we saw on the slide behind it.

11  Q.   But do you know where the drop went to?

12  A.   It's the same guy who picked it up, the jeweler from the

13  Manhattan store, the New York store.

14  Q.   This is the heavyset one?

15  A.   No.  The heavyset one came to my house in Tampa.

16  Q.   All right.  So -- you're right.  So you're going to meet

17  the New York guy.  So this is a third person in New York?

18  A.   Yeah.

19  Q.   Can you describe him?

20  A.   This one was 5'7", 5'8" in height, I would say 150 pounds,

21  had a mustache, had a beard, but that's all I remember right

22  now.

23          MS. CONTRERAS:  Apologies, Your Honor.  One second.

24  Forgot about pen and paper.

25  ///

SATHAWANE - DIRECT

```
 1  BY MS. CONTRERAS:

 2  Q.   Okay.  So I'm going to take a little pause here.

 3           Steve was skinny, skinny guy, is that --

 4  A.   That's the Bliss jeweler.

 5  Q.   Bliss jeweler.  Okay.

 6           Then there was another guy you didn't know.

 7  A.   Mm-hmm.

 8  Q.   Who was skinny?

 9  A.   (Nodding head.)

10  Q.   Then a third guy you didn't know who was heavier set?

11  A.   That -- so the second guy should be Bliss jeweler.  The

12  third guy is the guy that I don't know who was one of the family

13  members from Bond, from the conversations I heard, and the

14  fourth guy is the New York guy.

15  Q.   The fourth guy is the New York guy.

16           But these four people were all jewelers of some sort?

17  A.   Yes, that is what I --

18  Q.   As far as you thought?

19  A.   Yes.

20           MS. CONTRERAS:  Can we go to the next one.

21  BY MS. CONTRERAS:

22  Q.   What about this one?  Where did you drop here?

23  A.   I think this one went to Steve.  He actually drove down.

24  Q.   Drove down?

25  A.   Yeah.
```

SATHAWANE - DIRECT

1    Q.    To where?

2    A.    To Plant City.

3    Q.    To Plant City.

4    A.    No, it's actually Waffle House.

5    Q.    Waffle House.

6          Can we go to the next one.

7          Where did you drop here?

8    A.    This one's again Steve.

9    Q.    How about here?

10   A.    So this one is a Bliss jeweler.  This is the gas station

11   around I think a mile from the -- his store.

12   Q.    So the Bliss Jewelry store you've been talking about is in

13   Clearwater, Florida?

14   A.    Yes.

15   Q.    Can we go to the next one.

16   A.    This one's again the Bliss jeweler.  He actually came to

17   Tampa this time.  He wanted to ship the gold off, is what he

18   said.  That's why we met at a FedEx that was closer to him and

19   closer to me.

20   Q.    What about this one?

21   A.    I believe this is Steve.

22   Q.    Steve.  It's okay to say if you don't remember, "I don't

23   remember," too.

24   A.    Yep.

25   Q.    How about this one?

SATHAWANE - DIRECT

1    A.    This one's again Bliss jeweler.  It's the same gas station
2    that we saw earlier.
3    Q.    How about this one?
4    A.    This is Steve again.
5    Q.    Steve again?
6    A.    Yep.
7    Q.    So at this point, a lot of these are Steve?
8    A.    Yep.
9    Q.    How about this one?
10   A.    I want to say this is Steve, but I cannot be a hundred
11   percent sure.
12   Q.    Okay.  How about this one?
13   A.    This is actually the shopping plaza that the Bliss Jewelry
14   store is located in.  So this went to Bliss Jewelry.
15   Q.    So the address here is 2700 -- well, 27001, excuse me, U.S.
16   Highway 19 North?
17   A.    Yep.
18   Q.    So that's where the Bliss jeweler you've been talking about
19   is?
20   A.    Yes.
21   Q.    How do you know -- how do you know?
22   A.    This is a shopping plaza, so if you actually walk inside,
23   the first door that you see towards your right side is the Bliss
24   jeweler.
25   Q.    Okay.  Did you do that?

1    A.   I actually went to the store.

2    Q.   This time or another time?

3    A.   I think next time, not this one.

4         So this is a new person.  This is a jeweler from

5    Orlando.  She was a lady, a heavyset lady, darker skin,

6    brunette, but I don't remember the face.

7    Q.   Why do you say she was a jeweler?

8    A.   Again, she actually, like, was calling the people from her

9    store and making sure that what was going on.  And she's like,

10   Hold up, I need to actually confirm with the store.

11   Q.   She was on the phone with someone?

12   A.   She was talking to the store she worked in.

13   Q.   Well, you -- can you be sure that's who she was talking to?

14   A.   Yeah.

15   Q.   Why?

16   A.   Because I asked her what was the holdup, why you taking so

17   long?  So she said, My boss needs to make sure that this is the

18   token number.

19   Q.   Again, though, how did you know this was a jewelry store?

20   A.   That's what she said.

21   Q.   Where did you drop here?

22   A.   I think this is again the same person, the one from the

23   last one, the lady.

24   Q.   How about this one?

25   A.   This one, I don't think I actually ended up doing the

SATHAWANE - DIRECT

1    pickup.

2    Q.    Why do you say that?

3    A.    This is the one that got canceled, and I was waiting for

4    the pickup for half an hour, and when it didn't turn up, I was

5    sent back.

6    Q.    What about this one?

7    A.    So this one I don't remember.

8    Q.    Okay.

9              THE COURT:  That was 21.  It might be good just to

10   have --

11             MS. CONTRERAS:  Sure, yes.  I should put that on the

12   record.  You're right, Your Honor.  I should be saying 21, 22.

13   BY MS. CONTRERAS:

14   Q.    Okay.  So the last one was 21.  You said you don't

15   remember.

16   A.    No.

17   Q.    What about 22?

18   A.    22, this is Steve.

19   Q.    What about 23?

20   A.    It's Steve again.

21   Q.    What about 24?

22   A.    So this one I'm again not sure.  I want to say this is the

23   same guy from New York.

24   Q.    Okay.

25   A.    Who I think I believe I saw, but I cannot be a hundred

SATHAWANE - DIRECT

1   percent sure.

2   Q.   But this is in Tampa?

3   A.   Yes.

4   Q.   This is 25.  What about this one?  Do you remember?

5   A.   This is Bliss jeweler again.

6   Q.   How do you --

7   A.   This is downtown Tampa.  It's actually right off of 75.  So

8   he just took the exit, met me up here, and then went back to

9   Clearwater.

10  Q.   Okay.  So to be clear, you are not saying you dropped this

11  inside the store?

12  A.   No.

13  Q.   Okay.  Because this is not the same address as the mall.

14  A.   No.

15  Q.   All right.  So when you say this is Bliss Jewelry, what do

16  you mean?

17  A.   It was the same guy who drive up here and met me.

18  Q.   And sorry.  Remind us.  Remind us which guy is that again.

19  Describe him.

20  A.   The skinny Indian guy, a little short.

21  Q.   This is Number 26.  Do you remember where you dropped here?

22  A.   This is Steve.

23  Q.   Steve as well.  Okay.

24  A.   Yes.

25  Q.   So, again, a lot of these are Steve.

SATHAWANE - DIRECT

1              This is Number 27.

2    A.   This is the Bliss Jewelry store that I actually went in.

3    Q.   And this is the same address from before, right?

4    A.   Yes.

5    Q.   27001.

6    A.   Yes.  You can see down the Red Robin restaurant.

7    Q.   And you said you went into that store?

8    A.   Yeah.

9    Q.   Who did you see inside?

10   A.   It was the guy's father, I believe, because that's what he

11   said, My son's not here.  And when I asked him, Do you know

12   about this, he's like, Yeah.  He let me know what to do, and

13   then they actually collected the parcel.

14   Q.   Collected the what?

15   A.   The parcel, the package, the gold.

16   Q.   This is --

17   A.   This is again --

18   Q.   This Number 28.  Go ahead.

19   A.   It's the same person, Bliss Jewelry again.  It's the same

20   restaurant.

21   Q.   Okay.  So there's no address here, but you're saying this

22   is also in the Clearwater mall?

23   A.   Yeah.  If you see, it's the same restaurant, Red Robin.

24   Q.   This is -- sorry.  Did we skip 28 or was -- 28 was the

25   one --

SATHAWANE - DIRECT

1    A.    That was --

2    Q.    Okay.  So 28 was at the Red Robin, the mall in Clearwater.

3    A.    Yep.

4    Q.    All right.  So 29?

5    A.    This is Steve.

6    Q.    Steve.  And these are just like as far as you remember,

7    right?

8    A.    Yeah.  The thing is, I remember distinctly because each

9    time I went above Tampa or like came towards Orlando, it was

10   usually Steve.  If I went to Clearwater or towards Tampa,

11   downtown, it was Bliss Jewelry.  So that's how I know I can

12   distinguish between all of these.

13   Q.    This is Number 30.  Do you remember where you dropped here?

14   A.    This is the Orlando lady.

15   Q.    The lady you described before?

16   A.    Yeah.

17   Q.    This is Number 31.

18   A.    It's again the Bliss jeweler, the Red Robin restaurant.

19   Q.    The skinny guy?

20   A.    Yeah.

21   Q.    This is Number 32.  Where did you drop here?

22   A.    Again, the Bliss jeweler.  You can actually see they say:

23   Go in store.

24   Q.    Going to store.  Same address, 27 --

25   A.    Yep.

SATHAWANE - DIRECT

1   Q.   -- 001.  Okay.

2             This is Number 33, do you remember where you dropped

3   here?

4   A.   This is, this is the time I think -- that's the day I got

5   arrested, February 13th.

6   Q.   Okay.  Did you ever receive payment from any of the

7   jewelers?

8   A.   Yes, I did.

9   Q.   Who?

10  A.   The first payment from Bliss jeweler came as a Zelle

11  payment.

12  Q.   Sorry what?

13  A.   A Zelle payment.

14  Q.   Zelle?

15  A.   Yeah.

16  Q.   So can you spell that?

17  A.   It's Z-E-L-L-E.

18  Q.   Okay.  Got it.

19  A.   And I think it was under the name of Lotus Import and

20  Export.

21  Q.   Okay.

22  A.   The same day I think I got money from Steve as well.

23  Q.   Okay.  So the same day you received the Zelle payment --

24  A.   Yeah.

25  Q.   -- from Lotus Import and Export, you also got paid by

SATHAWANE - DIRECT

1    Steve?

2    A.   I don't remember if it was --

3    Q.   Or maybe around the same time.

4    A.   -- the same day, but like the first time I got paid by

5    Bliss Jewelry guy, that was the Lotus Import Export.  And the

6    first day, the Steve, I think those were two payments that came

7    to my account.  And he called his people and had them send it to

8    me.  He said he didn't have cash on him at the time.

9    Q.   And, again, you've established you thought Steve worked --

10   was a jeweler too?

11   A.   Yeah.

12   Q.   So you just mentioned Zelle.  Again, you've been here in

13   the courtroom --

14   A.   Yes.

15   Q.   -- for the past three days.  You saw the Government present

16   some exhibits about Zelle payments?

17   A.   Yes.

18   Q.   Correct?

19        Can you tell me what those Zelle payments were about?

20   A.   The small payments, the $400 payments, were actually Alex

21   or Sergio's commission.  He took a hundred dollars each time I

22   got paid.  So it's $400.  Like, he waited for four payments, and

23   then requested for the Zelle payment.

24   Q.   Okay.  What about the payment to Dhruv Gabani?

25   A.   So that one, at that time I was -- I had cash, and they

SATHAWANE - DIRECT

1   called me up and said that, Hey, this guy's in an ER and he

2   needs money.  So they were like, Hey, just send him some money,

3   and then we'll pay you off.  So I did that.

4   Q.   Did you know who he was?

5   A.   No.

6   Q.   Do you know if that's his real name?

7   A.   No.

8        MS. CONTRERAS:  Your Honor, this might be a good

9   stopping point, but I can keep going if you...

10       THE COURT:  Yeah, let's go another 15 minutes or so.

11       MS. CONTRERAS:  Okay.

12       THE COURT:  Is that good with everyone on the jury?

13       THE JURY:  (Nodding heads.)

14   BY MS. CONTRERAS:

15   Q.   Mr. Sathawane, the packages that you were delivering, did

16   you ever keep any of those packages?

17   A.   No.

18   Q.   Why not?

19   A.   Those weren't my packages to keep.  I was a driver, and my

20   job was just to pick packages up from one place and deliver them

21   to the jewelers, and it really wasn't, like, my package to keep.

22   I know that these people were buying and selling their gold off

23   of the market, so if -- I didn't -- like, I didn't want to mess

24   with that.

25   Q.   Did you know what was inside the packages?

SATHAWANE - DIRECT

1  A.    Yes, I did.

2  Q.    How?

3  A.    They had me open the package and inspect them and make sure

4  that there was gold or cash, whatever they had.  Like, they knew

5  what was coming in, and I had to send them pictures of

6  confirmation that that is what I picked up.

7  Q.    Did you know what the gold or coins were worth?

8  A.    Curiosity got the best of me.  I did a couple gold rate

9  searches and tried to figure out how much gold I was carrying.

10  Q.    You were what?  Sorry.

11  A.    How much gold I was carrying.  Like how much quantity and

12  how much money related to --

13  Q.    Are you saying "carrying"?

14  A.    Yeah.

15  Q.    Sorry.  Go ahead.

16  A.    So I made like -- I was aware of the ball park values of

17  the gold.

18  Q.    What was that?

19  A.    It was hundreds of thousands of dollars.

20  Q.    Hundreds of thousands of dollars.

21        So you had these packages in your car, hundreds of

22  thousands of dollars?

23  A.    Yes.

24  Q.    But you never kept any of them?

25  A.    No.

SATHAWANE - DIRECT

1    Q.    What did you think would happen if you kept them?

2    A.    I -- it would have been equal to stealing from the people

3    because they entrusted me with the packages to make sure they

4    went to the jeweler.  And if I kept the packages, it would have

5    been wrong to do.  And I was quite happy with my job, because I

6    was driving, and it was still better than hauling around

7    packages that weighed 60 pounds when I was working at the UPS.

8    So I didn't really think about stealing packages or something

9    like that.

10   Q.    You said it would have been like stealing from the people?

11   A.    That's correct.

12   Q.    Who?  Which people?

13   A.    The ones I picked up from, because they were actually

14   sending gold to jewelers, from what I believed.

15   Q.    From what you believed?

16   A.    Yeah.

17   Q.    The packages, did you always deliver them immediately, like

18   got them delivered?

19   A.    Yeah.  The packages always were delivered like after I

20   reached the point and, like, within 15 minutes.  So if the drive

21   was of 2 hours, I delivered the package in 2 hours, 15 minutes.

22   Like, it was just 15 minutes that usually took people to show

23   up.

24          I recall a couple of occasions when I had to actually

25   keep the packages with me, and it was just either weekend or if

SATHAWANE - DIRECT

1  it ran out of business hours or if I was late.  And that was the

2  time when they actually had me keep the package and deliver it

3  the next day but early in the morning.

4  Q.  Did they explain why you had to keep it?

5  A.  They just said the person picking up got busy or he

6  couldn't make it on the same day, so they said they'll do it the

7  next morning.

8  Q.  During the Government's case-in-chief, we saw -- and during

9  the transactions we just went over, you went out of state to do

10  some of these delivers?

11  A.  Yes, that is correct.

12  Q.  Deliveries, yeah.

13      Tell me more about the trips out of state.

14  A.  The first trip I went to New York.  I actually went to New

15  Jersey.  I was there for a week, five days.  My rental car was

16  running out, and at the end of the day, I actually got the

17  one -- the pickup that I did.  And after I actually dropped it

18  off, I went to the airport, got my car down, and I actually flew

19  back home.

20      The next time, I think they had -- they know for sure

21  that there was one pickup, so they sent me up.  I picked it up,

22  delivered it to the same person again, and then came back.

23      Actually, I did two that trip.  I picked up,

24  delivered, picked up, delivered and then came back home.

25  Q.  That was the New Jersey trip?

SATHAWANE - DIRECT

1   A.   Yeah, the New Jersey trip.

2   Q.   Any other trips out of state?

3   A.   I think I had third trip.

4   Q.   Sorry?

5   A.   I have more trips.  I went to Virginia, and I delivered one

6   in Virginia, in state.  Like picked up in Virginia, delivered it

7   to the guy in his condo.

8   Q.   Which guy?

9   A.   That's the one -- I don't know the guy, but he was at his

10  house, the one that I went to his house.  I think it was in

11  Manassas.

12  Q.   Had you seen him before?

13  A.   No, I seen him only once.

14  Q.   Only the one time at his condo?

15  A.   Yeah.

16  Q.   Any other trips out of state?

17  A.   No.  Like, each time -- so the New Jersey ones, I actually

18  had to drive up to PA and --

19  Q.   To PA?  What's that?

20  A.   I believe Pennsylvania.

21  Q.   Okay.  Go ahead.

22  A.   And I picked it up in Pennsylvania and dropped it off at

23  the Manhattan jewelry store, the New York guy.  So I think those

24  are the two trips.  I may have been mistaken, but that's the

25  best recollection.

1   Q.   So possible you don't remember other trips?

2   A.   Yeah.

3   Q.   Again, during the Government's case-in-chief, I think it

4   was yesterday, the last -- was that yester -- was that today?

5   Possibly today.

6           Anyway, you heard testimony from Mr. McConaha.

7   A.   That is correct.

8   Q.   Do you remember what he was talking about?

9   A.   I actually don't recall listening or hearing what he was

10  saying because I was on call at the moment.

11  Q.   Sorry.  Let's back up a little bit.

12          Mr. McConaha testified about an attempted drop.

13  A.   Yeah.  Pickup.

14  Q.   So this job was what?

15  A.   It was the same.  I had to go pick the package up and then

16  probably go and deliver to one of the jewelers.  I was there at

17  the location for half an hour, and it never took that long to

18  actually -- for me to get the package.  So I was on call with

19  Bond and asking him, Hey, what's going on, what's taking so

20  long.  And he was -- like, we were in middle of a conversation

21  when I see Mr. McConaha jump out of -- I think he came out of

22  the -- he jumped off the railing, he said, and I just seen him

23  like walk towards me and waving his hand.  And he was yelling,

24  but I couldn't hear anything.  But he was yelling and his hands

25  and making aggressive actions, so I just took off from there.

SATHAWANE - DIRECT

29

1    Q.    Sorry.  What was he doing with his hands?

2    A.    He was just making aggressive actions trying to -- like

3    tried to get me off of the street, so I just went away.

4    Q.    How close did he get to your car?

5    A.    He almost hit my hood, if I remember.  That's -- that's the

6    moment I panicked.  I'm like, what's happening?  I didn't want

7    to get shot at, so I just left the stuff, left the street.

8    Q.    Okay.  You are saying you couldn't hear him?

9    A.    I couldn't hear him.  My engine was running, my car was on,

10   there was music playing inside, and I was on a call.  So there

11   was no way I could hear him.

12   Q.    How about your windows?

13   A.    My windows were up.

14   Q.    Up?

15   A.    Yeah, and -- they were closed.

16          MS. CONTRERAS:  Ms. Durst, again, if you could kindly

17   please show me Government Exhibit 14-2.  This is one of the

18   reports, Report 2.  And this exhibit is already in evidence.

19          Page 84.

20   BY MS. CONTRERAS:

21   Q.    What date is this?

22   A.    This is January 17th of 2025.

23   Q.    Is that the date you remember for the McConaha incident?

24   A.    I believe that is the day.

25   Q.    What does the top message show?

SATHAWANE - DIRECT

1    A.    That is 10:36 a.m.  That's the morning, and it's just a

2    call for 19 seconds.

3    Q.    And the next one?

4    A.    Next one's again a call for 12 seconds, but this is at

5    5:36 p.m.

6    Q.    Okay.  And the next -- the next --

7    A.    This one's 9 seconds, 5:36.

8             MS. CONTRERAS:  Go to the next one, please.

9             THE WITNESS:  Is this one 32 seconds?  8:12.

10   BY MS. CONTRERAS:

11   Q.    8:12 p.m.?

12   A.    8:12 p.m.

13   Q.    Okay.  What about this one?

14   A.    This one's actually 14 minutes and 48 seconds.  And this

15   was that day, 13.  This is the call I was referring to when I

16   said I was on the call with Bond.  This is exactly what was

17   happening.

18   Q.    Okay.  So you were on the phone with Bond for 14 minutes?

19   A.    Yep.  It's almost 15 minutes, but...

20            MS. CONTRERAS:  Sorry, Your Honor.  Again, I think

21   this is a good stopping point.

22            THE COURT:  Okay.  We will take our lunch break now,

23   ladies and gentlemen.  And we'll go a little bit longer than

24   yesterday.  I have to tend to one other matter.  So, let's see.

25   It's 12:25.  Why don't you come back at 1:45.  That will give

 1    you an hour and 20 minutes.

 2              Does that work for everybody?

 3              THE JURY:  (Nodding heads.)

 4              THE COURT:  Okay.  If you'll be back in time to get

 5    through security, and we'll start back right at 1:45.

 6              Leave your pads there.  Do not talk about the case.

 7    Don't do any outside research or form any premature conclusions.

 8              Have a nice lunch.

 9         *(Jury excused.)*

10              THE COURT:  Sir, you can have a seat, go back to the

11    table by your lawyer.

12              All right.  Best estimate on what's left, in terms of

13    direct.

14              MS. CONTRERAS:  Let's see where I am at.  I am maybe

15    20 more minutes.

16              THE COURT:  Okay.  And then best estimate as to cross.

17              MR. HAPNER:  45 minutes.

18              THE COURT:  Okay.

19              MR. HAPNER:  Maybe an hour.

20              THE COURT:  All right.  Then what we'll do, let's talk

21    about the jury instructions now, and then I'll -- when I come

22    back, hand out a clean hopefully final.  I have added -- made

23    changes based on his decision to testify, and I think the only

24    remaining issue for now was your request for some specific

25    language.

 1              And do you have that request --

 2              MS. CONTRERAS:  Yes, yes, Your Honor.  I emailed it to

 3    Mr. Hapner.

 4              THE COURT:  All right.  Tell me what you want and

 5    where it would go.

 6              MS. CONTRERAS:  Sorry.  Should I also email to

 7    Ms. TiAnn?

 8              THE COURT:  How long is it?  You can just read it to

 9    me --

10              MS. CONTRERAS:  Sure, sure.

11              THE COURT:  -- if it's not long.

12              MS. CONTRERAS:  So I have two parts to it.  The first

13    one is language that I pulled from *U.S. v. Chandler*, and the

14    first part is:

15              If you should find that a reasonable doubt

16         exists as to whether the defendant had knowledge that

17         the package he was transporting had been embezzled,

18         stolen, or otherwise fraudulently acquired, comma, or

19         that he deliberately ignored whether the packages had

20         been embezzled, stolen, or otherwise fraudulently

21         acquired, comma, then you must find that defendant

22         not guilty.

23              And then the second part of the instruction is:

24    Negligence is the failure to exercise the due diligence, care,

25    or competence of a reasonable person.

1          So I would request that both parts be added, but if --

2          THE COURT:  All right.  Let's start with the second

3   one, and let me hear the Government's response to that.

4          MR. HAPNER:  The second one being the...

5          THE COURT:  Negligence.

6          MR. HAPNER:  I don't think that we need -- I object to

7   that.  I don't think that it's necessary in this case.  It's not

8   a civil automobile accident case.  The jury instructions do

9   include that word, but it is in a sequence of similar words like

10  foolishness and carelessness.  I think the jury can, you know,

11  reasonably apply that cautionary instruction to not hold him

12  accountable for his foolishness and carelessness, and I think

13  most people have a commonsense understanding of what negligence

14  is.

15         THE COURT:  Read me your definition again,

16  Ms. Contreras.

17         MS. CONTRERAS:  Negligence is the failure to exercise

18  the due diligence, care, or competence of a reasonable person.

19         But, Your Honor, I would also -- if Your Honor doesn't

20  like this definition, I would also be happy with Your Honor to

21  provide his own definition of negligence.  I just do think that

22  the jury needs a definition of negligence.

23         THE COURT:  All right.  Here's what I would propose.

24  I just add after the word foolishness:  Or merely failing to act

25  with the diligence or care that a reasonable person would,

SATHAWANE - DIRECT                                        34

 1   comma, is not enough to -- that would capture your definition.

 2           Any objection to do it that way?

 3           MS. CONTRERAS:  No, Your Honor.  That's great.

 4           THE COURT:  Mr. Hapner?

 5           MR. HAPNER:  That's fine.

 6           THE COURT:  All right.  So that -- the change is to

 7   take out the word "or" before foolishness and then adding the

 8   language I just read.  So that's in there now.

 9           And then the other piece, where would you want that?

10   And I assume that objection is going to be that that's already

11   captured, and I think it is.  I mean, we explain what it takes

12   to convict, and that's just saying it again.  And these are

13   already a little bit cumbersome, but where did you want to put

14   that?

15           MS. CONTRERAS:  Either before or after the definition

16   of negligence.  No preference to where it goes.

17           THE COURT:  Okay.  Let me hear -- well, that's a

18   separate issue from negligence.  And the negligence issue that

19   you're talking about just goes to the deliberate ignorance.  The

20   point you're making would go to both actual knowledge or

21   deliberate ignorance.  Right?

22           MS. CONTRERAS:  Yes, Your Honor.  But what we would

23   say is that the way that it's phrased, it's clearer because it

24   says if you find (a), then you must find the defendant -- you

25   know -- sorry.  If you find (a) or (b), then you must find the

SATHAWANE - DIRECT

1    defendant not guilty.

2              So that's what we would just say, that --

3              THE COURT:  Okay.

4              MS. CONTRERAS:  Yes, it is saying the same thing,

5    perhaps it's a little repetitive, but I do think there would be

6    no harm in making sure that we -- you know, given that knowledge

7    is the crux of this case that we give further definition of what

8    that entails, knowledge.

9              THE COURT:  Okay.  Mr. Hapner.

10             MR. HAPNER:  My primary objection is that it is

11   already covered at the bottom of page 1.  The Court will

12   instruct the jury that the Government must prove guilt beyond a

13   reasonable doubt; and if it fails to do so, you must find the

14   defendant not guilty.  And then it does lay out exactly what we

15   need to prove and what the elements are for that.

16             And in addition to that, I think that the proposed

17   language is slightly confusing and misleading in terms of the

18   references to embezzlement and theft or the word "stolen"

19   specifically.  That's not really...

20             MS. CONTRERAS:  Well, I would be fine with taking out

21   embezzled, stolen, and just -- or otherwise fraudulently

22   acquired and replacing all that with just fraudulently acquired.

23             And I can reread it like that if you want -- if you

24   would like.

25             THE COURT:  That's okay.  Just a moment here.

1          MS. CONTRERAS:  Sorry?

2          THE COURT:  Just a moment.

3          Yeah, I'm going to not include that.  I mean, the

4    concept you're after is that there has to be proof of deliberate

5    ignorance beyond a reasonable doubt, if that's going to be what

6    the jury relies on, and that is captured here in the pattern

7    where it says, in the same paragraph we were just talking about

8    with this example about the drugs:  You could find the defendant

9    knew about the possession of the controlled substance if you

10   determine beyond a reasonable doubt that, one, actually knew

11   about the controlled substance, or, two, had every reason to

12   know but deliberately closed his eyes.

13          So that's the substance of what you're after, isn't

14   it?

15          MS. CONTRERAS:  Yes, Your Honor.

16          THE COURT:  And it's right there in that same

17   paragraph.  All right.  That one's overruled.

18          Any other issues with the instructions?

19          MR. HAPNER:  Nothing from the Government.

20          MS. CONTRERAS:  Nothing from the defense, Your Honor.

21          THE COURT:  Okay.  Then what I'll do, I'll hand out a

22   clean copy when we come back that you all can, you know, go

23   through one more time -- and, actually, I'll try to make it

24   available if you're back early so you can go through it one more

25   time -- and then we'll continue on.

1           The only changes I've made is the one we just talked

2    about now at your request about the negligence and then changing

3    it to include the pattern provisions and remove the other

4    pattern provision related to whether the defendant's testifying

5    or not.

6           Okay.  So if you all will be back in one hour, at

7    1:35, I'll have these out there, ready for you, the jury

8    instructions, also a verdict form you can look at.  And then if

9    there's anything we need to address before the jury comes in,

10   you can let Ms. Stark know that, and we'll address it.

11   Otherwise, I'll just come out at 1:45, and we will continue on

12   with the case.

13          We will then recess after the defendant's testimony

14   concludes, and I guess you'll rest after that because that's

15   your only witness, correct?

16          MS. CONTRERAS:  Yes, Your Honor.

17          THE COURT:  And then we'll send them back and then

18   come out and do whatever's left.

19          Do you anticipate a rebuttal case?

20          MR. HAPNER:  I do, one witness.

21          THE COURT:  Would it be short?

22          MR. HAPNER:  Very.

23          THE COURT:  All right.  Then maybe what we'll do is

24   just after you rest, just have a brief sidebar, and you can

25   renew motions or do whatever you want to do, and then we can

1     just not take a break then.

2               MS. CONTRERAS:  Sure.

3               THE COURT:  Do your very short rebuttal, and then send

4     them out so we're not sending them out twice.

5               Okay.  Well, you all have a good lunch and be back at

6     1:35, please.

7          *(Luncheon recess taken from 12:38 p.m. to 1:45 p.m.)*

8                    **A F T E R N O O N   S E S S I O N**

9               THE COURT:  All right.  Everyone can have a seat.

10              Got everyone back, and I'm told all the jurors are

11    here, so if there's nothing we need to talk about, we'll bring

12    the jury in.

13              Everybody good?

14              MR. HAPNER:  Yes.

15              MS. CONTRERAS:  Yes.

16              THE COURT:  Mr. Sathawane, if you'll come back up

17    here, and then we can bring the jury in.

18         *(Jury present.)*

19              THE COURT:  All right.  Everyone have a seat.

20              Welcome back, ladies and gentlemen.  And, again, I do

21    want to thank you for being on time and ready, and we are ready

22    also, and so we'll just continue on with the direct examination.

23    The witness is still under oath from before.

24              So, Ms. Contreras, whenever you're ready.

25              MS. CONTRERAS:  Thank you, Your Honor.

SATHAWANE - DIRECT

1    BY MS. CONTRERAS:

2    Q.   Hi again, Mr. Sathawane.

3    A.    Hello.

4    Q.   Okay.  I want to go back to your encounter with

5    Mr. McConaha, okay?  After that happened, did you do anything to

6    find out what happened there?

7    A.   I was asked to wait at the nearby McDonald's store.  They

8    said they were trying to figure out what's happening.  And I was

9    waiting, I think, for half an hour more, maybe more.  And then I

10   called Bond again.  I'm like, Hey, well, what's happening?  He

11   said it's getting too late now.  We cannot get the token done,

12   so just go home, and we'll try to do it another day.

13   Q.   But did you ask them what was the deal with this guy?

14   A.   They didn't really tell me anything about that.  They just

15   said that there's some complications.  They didn't really say

16   anything about it.

17   Q.   Okay.  Sorry.  That wasn't quite my question.

18           I mean did you -- you said what they said about it,

19   but did you ask?

20   A.   I said what was happening, like what's going on, but they

21   just said that we are waiting for confirmation.

22   Q.   Okay.  Mr. -- can you please pull up Government Exhibit 23.

23           Mr. Sathawane, this exhibit is in evidence.  It is a

24   screen -- can you tell me what it is?

25   A.   This is a screenshot, a picture of my phone.

1  Q.   Okay.  And what does it say?

2  A.   It's a text message chat from Kuts, and the first message,

3  the first message reads:  "Tu call kar."  The next one is a

4  YouTube video, and then the one below it says "call."  Then I'm

5  replying him the next day at 7:30 -- 34 a.m.  "This is the real

6  I sent you."  "Reel."  "In November."  And then we see another

7  YouTube video.

8  Q.   Okay.  I'm going to ask you some questions about this.

9  First of all, who is Kuts?

10  A.   Kuts is my childhood best friend and still a good friend.

11  His name real name is Jones Lopez.  We grew up together.  He is

12  going to school in University of Texas, and he was also working

13  as a courier, and he was the one who introduced me to this.

14  Q.   The message on February 10, as you read, "This is the real

15  I sent you."  "Reel" asterisk.

16          What is a reel?

17  A.   A reel is an Instagram video that's less than a minute.

18  Q.   So what did you send in November?

19  A.   So the video that -- the reel we were talking about in

20  November was actually kind of a bullying video.  This guy when

21  he -- when the officer ask him about his residence, his status,

22  he's not able to reply to him, and the reel just has a big

23  caption underneath:  Get them out.  And that was all that was

24  about, that he couldn't speak English and he was still in the

25  country.

SATHAWANE - DIRECT

1    Q.    Couldn't speak -- who couldn't speak English?

2    A.    The guy in question, the one in white T-shirt that we're

3    looking at.

4    Q.    How did you send this reel?

5    A.    It was sent on Instagram on personal messages.

6    Q.    Why did you send this reel?

7    A.    The reel just showed up while I was scrolling randomly.  We

8    keep sending each other posts, like 15 or 20 posts every day, so

9    it was just one of those.

10   Q.    But I mean my question is, why did you think it was worth

11   sending?

12   A.    I told you, like it was a bullying video in a way, and we

13   keep making fun of each other, too, because we have heavy

14   accents as well, but we still speak English.  So that was the

15   whole joke behind it.

16   Q.    So it was a joke?

17   A.    Yeah.

18   Q.    Did you think it was funny?

19   A.    At the time, yeah.

20   Q.    And it was sent in November.  What year was that?

21   A.    2024.

22   Q.    So the reel you just described was in November 2024?

23   A.    Yep.

24   Q.    And -- but these text messages are from February.

25   A.    Yep, that is correct.

SATHAWANE - DIRECT

1   Q.   Of what year?

2   A.   '25, this year.

3   Q.   Okay.  So these were sent February 2025.  That was four

4   months after --

5   A.   Yeah.

6   Q.   -- November.

7        So Kuts sends you the first YouTube video?

8   A.   Yep, that's correct.

9   Q.   And says call.

10  A.   Yep.

11  Q.   Did you call him?

12  A.   Not at the moment because I was in bed already.  I actually

13  called him in the morning, and I let him know that this is the

14  reel I sent you in November.  And I tried to discuss with him,

15  but he wasn't really awake, so I just went on, went on with my

16  day.

17  Q.   Did you watch the video he sent?

18  A.   I started the video up before going to the gym, and I

19  looked at the first one minute, didn't really see anything

20  happening.  So I started scrolling, saw the second video, sent

21  it to him in the hopes that I would get back to it, but then I

22  just went on and I didn't look at them.

23  Q.   You mentioned the gym.  Was that -- when were you at the

24  gym, which -- because it's February 9 and then February 10.

25  A.   The February 10th, the morning of 7:30, that was when I was

1    preparing to leave.  So I was just fixing my breakfast and

2    looking at my messages and notifications.

3    Q.   Did you go back after and watch the whole video?

4    A.   I didn't actually.  I ended up calling Bond and asking him

5    like, Hey, I see a couple videos that says this is this.  Do you

6    know if there's something about this to do with us?  And at that

7    time he replied that, no, no, there's nothing to do with us.  We

8    don't do anything like that.  We just -- like he gaslit me into

9    believing that they were just buying and selling gold off of

10   people, and the people were actually getting the gold and the

11   money back.

12           I feel stupid right now to accept this, that I got

13   gaslit so easily but...

14   Q.   Why did you believe this?

15   A.   The biggest reason was in the past four months of me

16   talking or working, I kind of built emotional relationship with

17   them.  They used to inquire after me, they used to talk to me

18   every day even if I wasn't working.

19           There were times, when like I had my birthday, they

20   actually wished me.  There were times like the New Year's, the

21   holidays when they actually came back and replied to stuff,

22   wished me greetings.  So I ended up believing them.

23           And when they told me that it was jewelers buying and

24   selling gold off of the market and me going to jewelers most of

25   the times to deliver, I didn't really have any reason to doubt

SATHAWANE - DIRECT

1    them.

2    Q.   What did you think the jewelers were doing with the

3    packages?

4    A.   For the most parts, for the gold, I believed that they were

5    actually using the gold themselves.  They were buying it and

6    they were using themselves.  And for the cash, I believe that

7    they were actually selling some stuff off, like maybe gold or

8    maybe something other from the stores.

9    Q.   Okay.  You believe the jewelers were using the gold, but

10   did you believe anyone was getting paid?

11   A.   I did believe that the people who were actually sending the

12   gold to the jewelers were getting paid for their -- for the gold

13   they sent.  And it's a fairly common practice in India because

14   we don't have pawn shops.  So people, like, go to jewelers to do

15   this kind of stuff.  Like they either give gold and get money

16   without reporting taxes or they keep it as collateral and get

17   loans from the jewelers.  So.

18          And we -- it's a fairly common practice.  It's been in

19   existence since 1600s.  I think it's called hawala.  And so

20   that's why I thought that was what was happening.

21   Q.   When was the first time you found out what Alex and Bond

22   were really up to?

23   A.   That would be the day I saw you.

24   Q.   Who, me?

25   A.   Yeah, after my arrest.

SATHAWANE - DIRECT

1    Q.    What happened then?

2    A.    You had the police report, which you actually read it out

3    to me, which actually stated that the people are getting cheated

4    out of their money and possessions, and they were not actually

5    selling or buying stuff.

6          And it came as a big shock to me because I was still

7    believing that there was something wrong, like I wasn't supposed

8    to be arrested or something.  But I just feel stupid because

9    I -- I believed that the people were willingly doing everything.

10   When I went to them, they never -- like they never seem to be

11   under someone's -- like they were never -- they were willing to

12   do it.  They were calm.  They were either talking to on the

13   phone or just waiting for me by the driveway.

14         So I really thought that they were actually getting

15   their money or, like, they were buying something.  If I know

16   that there were getting cheated out of this, I would have never

17   taken this job in the first place.

18   Q.    How did you react when you found this out?

19   A.    Well, I mean, when I found out, I didn't really -- couldn't

20   really understand, like couldn't really seem to process

21   everything.  Because for a minute, I was believing that people

22   are getting everything.  They are making their money.  I was

23   doing my thing.  I was just driving off.  I was making my money.

24   People are having, like, good time.  They were getting their

25   money's worth.

1          And once I found out that they were getting cheated

2     out, I just felt bad.  Like, I really feel sorry for the people

3     that suffered.  It was never my intentions to hurt anyone or do

4     something illegal like this or to cheat someone out of their

5     funds.

6          And I -- I just -- I don't think I can ever forgive

7     myself for the people who lost their stuff, and that's why I

8     like tried to help law enforcement out to actually -- in hopes

9     of recovery.

10    Q.    Mr. Sathawane, why did you get involved with these people,

11    the organizers, Bond and Alex?

12    A.    At the time, I was just coming out of a car accident, and

13    the opposing party or the second party in the accident was an

14    uninsured driver.  So my insurance was like -- and I had state

15    minimum insurance, so my insurance wasn't going pay out

16    everything.  My car was left inoperable.  I had injuries:  My

17    lower back had multiple contusions, my shoulder was messed up.

18    I was bedridden for three weeks.  I was taking pain medications.

19          At the same time, the chiropractors and the MRIs were

20    racking up the bills.  I already had pushed like I think $7,000

21    in medical bills.  And I would have fallen back to my parents to

22    ask for some money, but my father had been laid out after post

23    COVID, layoffs that took place in November of '23.  So they were

24    struggling with money too, and they -- I just didn't see an

25    option at the time.

1           So when this call came in and when they say -- when

2    tell me that, hey, it's going to be $800, it seemed like a

3    blessing in disguise at the moment because it would have solved

4    all my problems.  I didn't -- I couldn't go to my UPS job either

5    because I needed help just getting out of my bed.

6           So by the time I actually started doing this, I was on

7    pain medications, I was renting cars, and I was starting to make

8    my money back.  The rent was coming up due.  I already owed my

9    roommate a couple months.  So I was really in a bad situation,

10   and it sounded like -- like it sounded too good to be true.

11          MS. CONTRERAS:  No further questions at this time,

12   Your Honor.

13          THE COURT:  All right.  Thank you.

14                          **CROSS-EXAMINATION**

15   BY MR. HAPNER:

16   Q.   Good afternoon, Mr. Sathawane.

17   A.   Good afternoon.

18   Q.   You also go by Andy?

19   A.   Yes, sir.

20   Q.   You were born and raised in India?

21   A.   Yes, sir.

22   Q.   And you can speak and write in Hindi?

23   A.   Yes, sir.

24   Q.   You can also speak and write in English?

25   A.   Yes, sir.

1    Q.   So you are bilingual?

2    A.   Multilingual.  But, yes, I have more languages.

3    Q.   What other languages do you speak?

4    A.   My mother tongue, that's Marathi, and there's a couple

5    regional languages from India that we -- I can understand.

6    Q.   So you speak at least three different languages?

7    A.   Yes, sir.

8    Q.   And you came to America on a visa to attend college?

9    A.   That is correct, sir.

10   Q.   In 2020, you were accepted to the University of South

11   Florida in Tampa?

12   A.   Yes, sir.

13   Q.   In fact, you got a $24,000 scholarship to go to Tampa?

14   A.   Yes, sir.

15   Q.   To USF, excuse me.  And you did, in fact, enroll at USF?

16   A.   Yeah.

17   Q.   You started attending classes in the fall of 2020; is that

18   right?

19   A.   I think that was the online semester, yes.

20   Q.   That's when you started?

21   A.   Yes.

22   Q.   In 2020?

23   A.   I may be wrong.  I did one semester online, and then I came

24   to States.  So is it 2020 or '21?  I cannot be sure.  I'm sorry.

25   Q.   Would you agree with me that you've been in America for

SATHAWANE - CROSS

1    approximately five years?

2    A.   Yeah, four years.

3    Q.   And when you were studying at USF, you were a mechanical

4    engineering student?

5    A.   Yes, sir.

6    Q.   And you were also in a fraternity?

7    A.   Yes, sir.

8    Q.   That's how you met your friends Yash Patel and, as you

9    referred to him in your phone, Roberto De Niro?

10    A.   Yes, sir.

11    Q.   Roberto De Niro's real name is Roberto Navarrete, right?

12    A.   Yes, sir.

13    Q.   Now, in this case, as you know, the Government alleges you

14    were involved in a fraud scheme from September 30th of 2024 to

15    the date of your arrest on February 13th of 2025.

16         At that time, you weren't going to school, were you?

17    A.   No, sir.

18    Q.   You dropped out because you were having financial problems?

19    A.   Yes, sir.

20    Q.   I think your defense counsel -- I don't know if you

21    mentioned it today, but your defense counsel mentioned in

22    opening that your father lost his job so you could no longer pay

23    tuition?

24    A.   Yes, sir.

25    Q.   And at that time, you were also in debt?

SATHAWANE - CROSS

1    A.    Yes, sir.

2    Q.    So during this time frame, your two primary sources of

3    income were both working at UPS part time and doing these gold

4    rushes?

5    A.    From October to February, that is correct.  I was working

6    just weekends at the UPS store, and in the weekdays I was doing

7    those.

8    Q.    Right.  So October to February, the time frame alleged in

9    this indictment, you were working at UPS part time?

10   A.    Yep.

11   Q.    And then you were also making money doing gold rushes?

12   A.    Yes, sir.

13   Q.    And by gold rushes, I mean you were going to people's

14   homes?

15   A.    Mm-hmm.

16   Q.    You were picking up packages of cash and gold?

17   A.    Mm-hmm.

18   Q.    Yes?

19   A.    Yes.

20   Q.    You have to say yes or no because it's being recorded.

21   A.    My bad.  Yes.

22   Q.    All right.  And then it would be -- and then your job was

23   to then transfer that package of cash or gold to other

24   individuals?

25   A.    Jewelers, but yes.

SATHAWANE - CROSS

1    Q.    Other individuals, yes?

2    A.    Other jewelers.

3    Q.    So is it your testimony today that everyone you transferred

4    a package of cash or gold to, you knew they were a jeweler?

5    A.    Most of the people, yes.

6    Q.    Most of them?

7    A.    I cannot be sure for everyone, but most of them, yes.

8    Q.    So you don't deny that you did the gold rushes in this

9    case?

10   A.    No.  I was picking up packages, and I was delivering them.

11          MR. HAPNER:  Can we pull up Exhibit 58, please.

12   BY MR. HAPNER:

13   Q.    I went over this yesterday with Agent Wisnaskas, and then

14   your defense counsel also went over it with you today.

15          With respect to Transaction Number 1, it's your

16   testimony that you transferred this amount of gold to a person

17   by the name of Steve?

18   A.    Yes.

19   Q.    And your testimony today is that the reason you thought

20   Steve was a jeweler is merely because he had a backpack of cash

21   or gold?

22   A.    That is correct.  And I also said that he gave call to his

23   jewelry shop to have me pay -- to have them Zelle me for the

24   payment.

25   Q.    You're saying that on this particular transaction, the very

SATHAWANE - CROSS                                    52

1    first transaction that you did, you overheard Steve on the phone

2    having a call with his jewelry shop?

3    A.   That's what he said, but yes.

4    Q.   What do you mean what -- that's what he said?

5    A.   He said, I have to call the shop to get them to Zelle you.

6    I don't have cash on me.

7    Q.   Okay.  So you're -- so you're saying Steve told you that he

8    needed to call the shop in order to get you paid for making this

9    specific --

10   A.   Yes.

11   Q.   -- transfer?

12          Okay.  And then on the second one, if we could look at

13   that, you said you went to Bliss Jewelry store?

14   A.   I said I met the guy from Bliss Jewelry store, yes.

15   Q.   But you would agree with me you met the guy from Bliss

16   Jewelry store in an ALDI's parking lot?

17   A.   Yes.

18   Q.   And this transaction occurred at around -- this transfer of

19   cash, I believe this was a hundred thousand dollars of cash, was

20   at 7:47 p.m.?

21   A.   Yes.

22   Q.   And you thought you were delivering this cash?

23   A.   Mm-hmm.

24   Q.   There was no gold in this transaction, right?

25   A.   No.

SATHAWANE - CROSS                                      53

1   Q.   You thought that you were delivering this cash to an

2   individual that is a jeweler?

3   A.   Yes.

4   Q.   At 7:47 p.m. in an ALDI's parking lot?

5   A.   Yes.

6   Q.   If we could go to Number 4, please.

7            In this transaction on October 19th of 2024, you

8   picked up more cash.  This time $60,000.  And it's your

9   testimony that you transferred the first part of this to a

10  family member of Bond; is that correct?

11  A.   That is correct.

12  Q.   Okay.  And then you were under the impression from this

13  transaction that that family member of Bond also worked for a

14  jewelry store?

15  A.   Yeah.

16  Q.   Okay.  And what led you to believe that?

17  A.   The shop he came from, it was actually a jewelry store.  It

18  had the glass painted and said "jewelry" on it.

19  Q.   Okay.  And this is the first and only time --

20  A.   Yeah.

21  Q.   -- that you met with a family member of Bond to transfer

22  the cash?

23  A.   Yes.

24  Q.   All right.  And yet Bond was the person that you were

25  communicating with for every single one of these transactions?

SATHAWANE - CROSS                          54

1   A.   Yes.

2   Q.   So why didn't you meet with Bond's family member more

3   often?

4   A.   I wouldn't know.

5   Q.   And again, this is transferred to this jewelry store, has

6   no gold whatsoever involved, does it?

7   A.   No.

8   Q.   And let's talk about when that transfer took place.

9        You picked up this cash, $60,000, from an unknown

10  victim on October 19th, but there was nobody to pick it up, was

11  there?

12  A.   The half one.

13  Q.   Initially.

14  A.   Half part went to the people, and the next day I had to go

15  again to I think -- I think I said Bliss, but I cannot be sure.

16  Q.   Okay.  Well, let's break that down.

17       So first of all, by the time you -- so on

18  October 19th, you're getting these messages from Bond that we

19  can see in the middle where he says please -- the guy's not

20  picking up the phone right now.

21  A.   Yep.

22  Q.   So it's your testimony he's referring to his own family

23  member as "the guy," and that person is not picking up the

24  phone?

25  A.   Yep.

SATHAWANE - CROSS

1    Q.    All right.  And then he tells you to keep 58,900 safe?

2    A.    Yep.

3    Q.    And what did he mean by that?

4    A.    He didn't want me to leave my house or, like, get the

5    cash -- move the cash around.

6    Q.    But you picked up $60,000?

7    A.    Yeah.

8    Q.    So what were you supposed to do with that $1100?

9    A.    That was my payment to actually go and pick up.

10   Q.    So for these off-market jewelry transactions that you were

11   engaged in, some of which involved purely cash and no gold

12   whatsoever, you were paid from the investors' cash?

13   A.    Yes.

14   Q.    Okay.  And he tells you, Please don't leave alone the

15   money.  And so you took this investor's cash back to your house

16   in Tampa, Florida?

17   A.    Yes.

18   Q.    And it wasn't the next day that you delivered it, was it,

19   it was two days later?

20   A.    It was the weekend, so I think the next day we's looking at

21   is a Monday.

22   Q.    Right.  So you kept this cash, $60,000, and you took it to

23   your house in Tampa, Florida?

24   A.    Yeah.

25   Q.    All right.  And you kept it for two days?

1          MS. CONTRERAS:  Asked and answered, Your Honor.

2          THE COURT:  It's overruled.

3    BY MR. HAPNER:

4    Q.    And you kept it for two days?

5    A.    Yes.

6    Q.    And then you had to deliver some of that cash on

7    October 21st, but for that transaction, you didn't give away the

8    58,900, did you?

9    A.    I don't believe so.

10   Q.    You gave away 33,600?

11   A.    Yes.

12   Q.    Or as Agent Wisnaskas pointed out, there's a discrepancy

13   here.  The bottom says 33,650.  But either way, you gave around

14   $33,000 two days later from that transaction?

15   A.    Yes.

16   Q.    And that was to the -- Bond's family member, right?

17   A.    Yes.

18   Q.    All right.  And then the next day, if we could turn the

19   page to 4B, he tells you that there's 25K remaining?

20   A.    Mm-hmm.

21   Q.    And then was it your testimony earlier today, tell me if I

22   misunderstood that, you said you had to make -- you delivered

23   this cash to someone else because there was an issue where

24   somebody was in the emergency room?

25   A.    The person in question is this guy, Siv [phonetic] the one

SATHAWANE - CROSS

1    that I sent the money to, he was in the emergency room and he

2    needed money to pay his bills and get out.

3    Q.    Got it.  So Mr. Dhruv Gabani, who Bond must have known

4    personally, right?

5    A.    Yep.

6    Q.    And Bond was familiar with Dhruv Gabani's personal

7    situation where he had to go to the emergency room?

8    A.    Mm-hmm.

9    Q.    Yes or no?

10   A.    Yes.

11   Q.    All right.  And then so Bond -- this time he's going by

12   Spectre Bond, right?

13   A.    Yes.

14   Q.    Spectre Bond directs you to make a payment of $3200 total?

15   A.    Mm-hmm.

16   Q.    Yes or no?

17   A.    Yes.

18   Q.    Okay.  And then you then -- you just transferred -- well,

19   there's two.  Let's break this down a little bit.

20           So there's two Zelle transactions that are happening

21   here?

22   A.    That is right.

23   Q.    One is for 1200 and one is for 2,000?

24   A.    Yes.

25   Q.    You didn't make both of those transactions, did you?

SATHAWANE - CROSS

1   A.    No.

2   Q.    You asked your friend, Yash Patel, who you met in your

3   fraternity at USF, to make one of those payments, didn't you?

4   A.    Yes.

5   Q.    And then when Yash Patel asked you who the payment was for,

6   he said who's the N word.   Remember that?

7   A.    Yeah.

8   Q.    Your response was another gold rusher?

9   A.    Uh-huh.

10  Q.    Yes or no?

11  A.    Yes.

12  Q.    Okay.  So this wasn't a payment to somebody for an

13  emergency room situation, was it, it was payment to another gold

14  rusher?

15  A.    That was told to me that he's the one who also works as a

16  courier, and he's in the emergency room right now, so he needs

17  to get out and pay.

18  Q.    Oh, so it's just a coincidence he's also a gold rusher but

19  happens to be having this medical emergency?

20  A.    I mean, Bond was the common connection, and he's the one

21  who deals with all of us, so I deduced that he was what he was

22  saying.

23  Q.    You would agree with me that when you asked your friend

24  Yash Patel to make this Zelle payment on your behalf that

25  Spectre Bond is asking you to make to Dhruv Gabani, you didn't

1   mention anything about a medical emergency, did you?

2   A.    I didn't have to because I saw him.

3   Q.    You're saying you saw Yash Patel face to face?

4   A.    I saw him in person.

5   Q.    And it's your testimony today that you told him in person

6   that this is for a medical emergency?

7   A.    Again, like we don't really have to say all of those things

8   because we hang out every day.  So he believes me, and I have --

9   like, I have been loaning him money or taking money from him, so

10  it's an ongoing account between both of us.

11  Q.    Okay.  Well, regardless, you did make the 2,000 payment

12  yourself, right?

13  A.    Uh-huh.

14  Q.    And where did that 2,000 come from?

15  A.    From the money, the 25,000 that I had remaining.

16  Q.    The investor's money?

17  A.    Yeah.

18  Q.    If we could turn to Transaction 11, please.

19        Transaction 11, correct me if I'm wrong, is the first

20  time that you testified that you were providing other victims'

21  cash and gold to the individual from Bliss Jewelry?

22  A.    Not really.  The second one went to the guy from Bliss

23  Jewelry as well, the cash transaction.

24  Q.    My mistake.  You're right.  The one in the ALDI's parking

25  lot at night.

SATHAWANE - CROSS

1    Okay.  So then is Transaction Number 11 the second
2  time that you transferred this money to an individual from Bliss
3  Jewelry?
4  A.   I cannot be sure.  I need to go through the transactions.
5  I don't remember all of them.
6  Q.   Fair enough.
7    This one, you did say, though, just to confirm, that
8  this was a transaction with an individual from Bliss Jewelry?
9  A.   Yes.
10  Q.   And this is not at Bliss Jewelry, is it?
11  A.   No, it isn't.  This is around the block.  I think it's a
12  mile from the Chase, nearest Chase store.  So he came out, went
13  to the Chase Bank, and then...
14  Q.   This is actually at a Chick-fil-A at Clearwater, Florida,
15  though, isn't it?
16  A.   You're looking at the Wawa right now.  It's in the same
17  plaza.  Chick-fil-A's right next to it.
18  Q.   Okay.  Well, why couldn't you just meet him at Bliss
19  Jewelry if this was a Bliss Jewelry transaction?
20  A.   That was something I asked him, too, but they just said
21  that's the most convenient spot.
22  Q.   Well -- all right.  So they're convenient because they're
23  so close -- they're so close together?
24  A.   It's halfway through for him to show up there and for me to
25  go all the way there, because I was supposed to go back to Tampa

1   to my house.

2   Q.   I don't think you answered my question.

3        They're close in proximity, is that your testimony?

4   These two locations, Bliss Jewelry and the Wawa?

5   A.   I do want to say so, but I couldn't be sure.

6   Q.   So as a matter of convenience, you could have just went a

7   short little bit distance further and gone --

8   A.   I had been on the road --

9   Q.   Excuse me, sir.

10  A.   -- for five years.  I'm sorry.

11  Q.   Please let me finish the question because the court

12  reporter can't --

13       MS. CONTRERAS:  Your Honor, it's asked and answered.

14       MR. HAPNER:  -- can't transcribe --

15       THE COURT:  There's not a question pending, so that

16  objection's overruled.

17       You can ask a question.

18  BY MR. HAPNER:

19  Q.   And I just wanted to say that the court reporter can't get

20  both of us.

21  A.   I'm sorry.

22  Q.   I'm not trying to be rude, it's just she can't get both of

23  us at the same time.

24       So what I'm saying is if this was a matter of

25  convenience, why couldn't you have driven the short distance

SATHAWANE - CROSS

1    further to just go in the Bliss Jewelry store to complete this

2    legitimate transaction involving 65 ounces of gold?

3    A.    I was on the road for, I believe, more than six hours

4    already, and I was eager to go home; and, second, is the Bliss

5    Jewelry guy, he wanted to come out to the Chase Bank that's on

6    the next block, and then he said just meet me at the Wawa.

7    Q.    Okay.  Can we look at 12, please.

8          You testified earlier that this transaction was also

9    with Bliss Jewelry?

10   A.    That is correct.

11   Q.    Now, this one is also not at Bliss Jewelry, correct?

12   A.    That is correct.

13   Q.    It's at the FedEx office?

14   A.    Uh-huh.

15   Q.    Is that FedEx office located in close proximity to the

16   Bliss Jewelry store?

17   A.    No.

18   Q.    Okay.  So then why --

19   A.    It's downtown Tampa.

20   Q.    I'm sorry?

21   A.    It's downtown Tampa.

22   Q.    So then why are you meeting him here instead of going in

23   the store?

24   A.    He wanted to ship the gold off at that particular day, and

25   6:00 p.m. was the cutoff time from FedEx.  He actually had

SATHAWANE - CROSS

1    coordinated to go much down, but I couldn't make it in time.  So

2    he drove up to the FedEx that was still open.

3    Q.   Wait a second.  So you knew what the owner of Bliss Jewelry

4    was doing with this gold after you transferred to him?

5    A.   That's what he said.  He wanted to ship it off to the

6    FedEx.  That's why he came all the way to Tampa.  Because I

7    asked him the same question, why are you here?

8    Q.   Where is he shipping it to?

9    A.   I have no idea.

10   Q.   Can we look at the next one.

11         So now we're on Transaction 13, and I believe you

12   testified that this transaction involved you transferring

13   32 ounces of gold and $37,000 of cash to an individual by the

14   name of Steve.

15   A.   That is correct.

16   Q.   What is Steve's full name?

17   A.   I don't know.

18   Q.   What jewelry store did he work for?

19   A.   Some jewelry store in Orlando.  That's what I know or,

20   like, that's what I could deduce.

21   Q.   Would you agree with me you drove significant distances all

22   over the state of Florida and even in other states to do these

23   transactions?

24   A.   Yes.

25   Q.   Why didn't you meet him at his jewelry store in Orlando for

SATHAWANE - CROSS

64

1    this one?

2    A.    Because it was too far out of the way for me.  If you can

3    see, it's four hours and 225 miles already.  If I went to

4    Orlando, it would have been more time.

5    Q.    So Steve was just being a nice guy, trying to help you out?

6    A.    He's usually -- comes around to Lakeland to pick stuff up

7    from me.  So it was halfway for us.  I come up from Tampa; he

8    comes down from Orlando.

9             MR. HAPNER:  Can we blow up the middle part of this?

10   BY MR. HAPNER:

11   Q.    Isn't it true that right before this transaction -- this is

12   one of the first times you met -- you met Steve after either

13   Bond, 007, or Spectre Bond gave you his phone number?

14   A.    I think so.

15   Q.    And then on this particular occasion, he was actually

16   flying in from another state?

17   A.    Mm-hmm.

18   Q.    Yes or no?

19   A.    Yes.

20   Q.    And when he flew in, there was a discussion between you and

21   him over a period of time about when he would be landing, so you

22   were waiting to do this?

23   A.    Yes.

24   Q.    In fact, you were waiting on him.  It wasn't a matter of

25   him trying to help you out and be more convenient for your

 1    situation, was it?

 2    A.    I mean, the store is closer to the airport.  So he was

 3    getting a rental car, and he had to come down.

 4    Q.    For this particular transaction, isn't it true that Steve

 5    told you to pick a 24-hour fast-food spot instead of a gas

 6    station because it's less conspicuous?

 7    A.    That is correct.

 8    Q.    And then Steve ended up picking the location?

 9    A.    Yes.

10          MR. HAPNER:  If we can go to the next one.  And, I'm

11    sorry, stay on that one.  Then let's see the bottom right-hand

12    section of this.

13    BY MR. HAPNER:

14    Q.    And for this particular transaction with Steve, after he

15    comes into the airport, he tells you where to go?

16    A.    Mm-hmm.

17    Q.    And then you complete this transaction at 1:55 a.m.?

18    A.    That is correct.  That's why we picked up a location that

19    wasn't conspicuous.  We were afraid that we might get mugged at

20    gunpoint.  It wasn't really a good neighborhood.

21    Q.    Near the Tampa airport?

22    A.    Yeah.

23          MR. HAPNER:  14, please, the next one.

24    BY MR. HAPNER:

25    Q.    You testified that this was another transaction with Bliss

1    Jewelry?

2    A.    That is correct.

3    Q.    And yet it's another transaction that is not in Bliss

4    Jewelry?

5    A.    That is correct.

6            MR. HAPNER:  And then can we go to 18, please.

7    BY MR. HAPNER:

8    Q.    You testified that this transaction was with a heavyset

9    lady who you met in a Publix shopping center parking lot?

10   A.    That is correct.

11   Q.    At 8:00 p.m. at night?

12   A.    Yep.  Yes.

13   Q.    Another transaction involving purely cash?

14   A.    Yes.

15   Q.    I believe this was Mr. Waldrop's $50,000, and you took $700

16   of that as your own payment?

17   A.    Yes.

18   Q.    And for this one, you say -- you were asked multiple times

19   by your defense counsel, how do you know that she worked for a

20   jewelry store?  And at first you said you heard her calling from

21   the store, similar --

22   A.    Yes.

23   Q.    -- story to what you said about Steve, right?

24   A.    Yes.

25   Q.    And then you later said that's what she said.

1    A.   She said she's calling her boss.  That's what I said.  And,

2    like, she said -- she's saying to ask who, like, her boss if the

3    token number is correct.

4    Q.   So it just so happens that when you meet these people that

5    you don't know -- you described them as random people at first,

6    right?

7    A.   That is correct.

8    Q.   You meet these random people in random parking lots, and it

9    just so happens that whenever you're not in a jewelry store,

10   they happen to be talking about working for jewelry stores?

11   A.    I mean, I figured that Bond was talking to multiple

12   jewelers, and he was just coordinating us so that we could come

13   meet and do the exchange.

14           MR. HAPNER:  Okay.  Could we turn to 20, please.

15   BY MR. HAPNER:

16   Q.   This one, you testified that this was the run that was

17   canceled?

18   A.    That is correct.

19   Q.   Right.  And this is the one that we heard Mr. McConaha

20   testify about earlier?

21   A.    Yes.

22   Q.   You said you did not actually -- you admit, though, that

23   he -- you saw Mr. McConaha?

24   A.    Yes.

25   Q.   In front of Ms. Anderson's property?

1   A.   Yes.

2   Q.   And you said that you saw that he appeared visibly

3   agitated?

4   A.   Yes.

5   Q.   And he was waving his arms at you?

6   A.   Yes.

7   Q.   But you have no idea what he was saying?

8   A.   No.

9   Q.   And the reason you have no idea what he was saying is

10  because you had, number one, your music on?

11  A.   Mm-hmm, yes.

12  Q.   And you also were speaking on the phone with Bond?

13  A.   Yes.

14  Q.   Right.  And the reason -- you testified, I wrote this down,

15  that the reason you were having a call with Bond at that time is

16  because you had been waiting so long?

17  A.   Yes.

18  Q.   So that's why you initiated that phone call with Bond.

19  A.   Yes.

20  Q.   As you were waiting at Ms. Anderson's property, you were

21  concerned about what was happening -- well, let me rephrase

22  that.

23       You were not understanding why it was taking so long?

24  A.   Yes.

25  Q.   So you picked up the phone and you called Bond?

SATHAWANE - CROSS

1   A.    Yes.

2   Q.    Okay.  At that time?

3   A.    Yes.

4   Q.    After you had waited how long?

5   A.    I don't remember exactly how long, but it wasn't like the

6   usual times.

7   Q.    Give me an estimate.

8   A.    I would say 15 minutes.

9   Q.    Okay.  So your lawyer pulled up a report of the phone call

10  that you had.

11          Can we look at that.  It was 14-2, page 84.

12          And it was the second bubble.  Actually, the -- I'm

13  sorry.  Keep going.

14          This one here, the last bubble on page 84, is that

15  right -- or it was a longer call.  Maybe it's the next one?

16          There it is.

17          All right.  So now we're on page 85.  It's the first

18  blue bubble.  This is the 14-minute call on January 22nd, 2025.

19  It's actually Bond who initiates this call -- or this time he's

20  going by 007?

21  A.    Yes.

22  Q.    But Bond is the one that's calling you.

23  A.    No, you can see I started the call.  813-705 started a

24  call.  That's my phone number.

25  Q.    Oh, my mistake.

SATHAWANE - CROSS

1          Okay.  So you started the call January 22nd at

2    8:13 p.m., correct?

3    A.   Yes.

4          MR. HAPNER:  All right.  Now can we look at Report 1,

5    please.  Page 1155.  Can we see this map.

6    BY MR. HAPNER:

7    Q.   This is the map that you sent at 8:16 p.m. saying that

8    you're 8 minutes away, right?

9    A.   Yes.

10   Q.   So you still had not arrived at that location by 8:30?

11   A.   I had arrived at the location.  You can see, it says 8:16.

12   I was in the area, but I had just missed a turn.  So I went all

13   the way across and came back.  And that's just the 8-minute

14   delay that we're looking at.

15   Q.   But earlier you said that you had been waiting at

16   Ms. Anderson's property for at least 15 minutes.

17   A.   I said I couldn't be sure for it, but that is, yeah, that

18   is what I said.

19   Q.   You couldn't be sure about how long you waited, but you did

20   wait, right?

21   A.   That is correct, yeah.

22   Q.   And you made the call to Bond at 8:12, but you weren't even

23   expected to arrive until at least 8:16?

24   A.   If you scroll up, you should see more maps, and then we'll

25   have a better idea.

SATHAWANE - CROSS

1   Q.   Okay.  But in any event, you said you didn't hear what was

2   happening when you called Bond.  You asked him why is this run

3   not being successful after you had the interaction with

4   Mr. McConaha, so you went to the McDonald's.  And then you asked

5   him what was happening, and he didn't give you a satisfactory

6   answer, right?

7   A.   No, he just said that it didn't work out and you'll get

8   paid tomorrow or the next run you do, so just go home.

9   Q.   And so your testimony is that you had -- you were

10  communicating with Bond during those 14 minutes, right, but at

11  the same time, you had your music playing?

12  A.   That's correct.

13  Q.   How could you do both at the same time?

14  A.   The music was on stereo.  It's a old car, so I don't have

15  CarPlay on there.

16  Q.   Right.  But how could you hear him on the phone if you had

17  your music playing?

18  A.   I had my earplugs in.

19  Q.   Okay.  So you had your AirPods, you were communicating with

20  him, and you had the music playing?

21  A.   Yeah.

22  Q.   And so you had no idea what Mr. McConaha was saying?

23  A.   No.

24  Q.   Why didn't you get out to talk to him?

25  A.   He seemed visibly agitated, and the street was completely

SATHAWANE - CROSS

1    dark.  Like there was no streetlights or anything.  So I got

2    scared.  I was worried that this might end up in an altercation

3    I don't want to face.  That's why I just left the area.

4              MR. HAPNER:  Okay.  Can we go back to Exhibit 58 and

5    look at transaction 24.

6    BY MR. HAPNER:

7    Q.   All right.  So for Transaction 24, I think you testified

8    you're not sure who picked -- who you gave this 144 ounces of

9    gold to, but it might be the guy from New York.

10   A.   That's -- yeah, that is what I said.

11   Q.   So it's your testimony that the individual working in the

12   Diamond District from New York City came down here to Tampa,

13   Florida, to pick up the gold for this transaction?

14   A.   As I said, like I cannot be a hundred percent sure that it

15   was the same person.  I don't remember.  It's been more than a

16   year now.

17             MR. HAPNER:  Okay.  Can we look at 27, please.

18   BY MR. HAPNER:

19   Q.   27 is the first time that we see a reference to Bliss

20   Jewelry in any of the communications.  This is a photograph that

21   Bond sent you, right?

22   A.   Yes, that is correct.

23   Q.   Okay.  And he told you to go to the Red Robin, and you

24   actually went in the store for this transaction?

25   A.   That is correct.

1   Q.   And your testimony earlier was that you saw the guy's

2   father.

3   A.   That is correct.

4   Q.   So were you familiar -- considering the amount of

5   transactions that you did with these jewelers from Bliss

6   Jewelery, would you say you were generally familiar with what

7   they look like?

8   A.   Indian guys, short.

9   Q.   I'm not asking you to describe them.  I'm just saying do

10  you know what they look like?

11  A.   Yes, I would say so.

12  Q.   You met several of them?

13  A.   Just two of these people from Bliss Jewelry.

14  Q.   You met two of the people from Bliss Jewelry face to face?

15  A.   Yes.

16  Q.   All right.  Similarly, you met the victims in this case

17  face to face?

18  A.   Yes.

19  Q.   You never got out of your car, but you drove up, you had

20  sufficient time to determine if this is the right person, and

21  then these individuals actually came up to your car and put

22  packages of cash or gold into your vehicle, right?

23  A.   Yes.

24  Q.   And sometimes you saw the same person multiple times?

25  A.   Yes.

SATHAWANE - CROSS

1    Q.    Mr. Bidgood III, you saw him on three separate occasions?

2    A.    Yes.

3    Q.    You went to his house three times in Jacksonville, Florida,

4    and took his gold?

5    A.    Yes.

6    Q.    You also saw Ms. Southall multiple times?

7    A.    Yes.

8    Q.    You knew that each one of them was handing over significant

9    amounts of money?

10    A.    Yes.

11    Q.    You even admitted on your direct that you had researched

12    the values of gold --

13    A.    Yes.

14    Q.    -- which we saw in Exhibit 14-23?

15    A.    Yes.

16    Q.    And even without doing the research, you know that gold is

17    very valuable?

18    A.    Yes.

19    Q.    And you were also given significant amounts of cash?

20    A.    Yes.

21    Q.    In your direct examination, you describe it as hundreds of

22    thousands of dollars of cash?

23    A.    It was gold, but I said it was hundreds of thousands of

24    dollars of gold.

25    Q.    You picked up at least tens of thousands of dollars of

SATHAWANE - CROSS

1   cash?

2   A.   Yes.

3   Q.   And you knew the contents of every single package because

4   you had to verify it?

5   A.   Yes.

6   Q.   We saw many of the pictures.  You had a box cutter sitting

7   on your seat?

8   A.   Yes.

9   Q.   And that's because after these individuals would hand you

10  these packages of cash or gold, you immediately opened it up,

11  and you dumped it out on your seat, whatever vehicle you were

12  driving?

13  A.   Yes.

14  Q.   And did you count it?

15  A.   Sometimes, yes.

16  Q.   All right.  And then you would send those -- you would then

17  take a picture of the contents of the package and send it to

18  Bond?

19  A.   Yes.

20  Q.   And then Bond would respond with the exact amount of gold

21  or cash that he was expecting to receive and that you had

22  verified?

23  A.   Yes.

24  Q.   And then it would also be counted when you transferred this

25  cash and gold to other persons, right?

SATHAWANE - CROSS

1  A.   When they collected, they made sure they counted what

2  they're getting, paid me, and then signed the note, signed the

3  dollar bill.

4  Q.   Okay.  The dollar bill.  And they would -- who would do the

5  handwriting on that?

6  A.   It's the people collecting it.

7  Q.   So the people that you were transferring it to in these

8  random parking lots would handwrite on the dollar bill?

9  A.   Yes.

10  Q.   Okay.  And they would put both the amount of cash or gold

11  that you're transferring, as well as the amount you're being

12  paid for the transaction?

13  A.   Yes, because they were the ones who were paying me.  They

14  were the ones who were bringing the cash or Zelles.

15  Q.   All right.  Based on what we had gone over, you would agree

16  with me that you've done over 30 gold rushes, right?

17  A.   Yes.

18  Q.   In your interview with Detective Torres that took place on

19  February 13th, 2025, shortly after you were picked up at

20  Mr. Oliver's residence, he asked you how many pickups and

21  dropoff jobs you have done, correct?

22  A.   Yes.

23  Q.   You said it was under ten.

24  A.   That is correct.

25  Q.   But that was not true.

SATHAWANE - CROSS

1    A.    No, it wasn't.

2    Q.    You knew at that time that you had done way more than ten

3    transactions.

4    A.    I did.

5    Q.    So that was a lie?

6    A.    It was.

7    Q.    You would agree with me that you picked up cash or gold or

8    sometimes both?

9    A.    Yes.

10    Q.    But when you were interviewed by Detective Torres you said,

11    quote, It's been gold every single time.

12    A.    Yes.

13    Q.    That was also not true?

14    A.    It wasn't true.

15    Q.    You would agree with me that you did your first gold rush

16    on October 4th, 2024, and, in fact, you did two runs that day?

17    A.    Yes.

18    Q.    But when you were interviewed at the police station,

19    Detective Torres asked you when you started doing this, and you

20    said January, last month?

21    A.    Yes.

22    Q.    That was also a lie?

23    A.    Yes.

24          MR. HAPNER:  Could we pull up Exhibit 54, please.

25    Highlight the first half.

1    BY MR. HAPNER:

2    Q.   Now, this wasn't like you missed just one or two runs,

3    right, because by the end of December, you had done 15 runs?

4    A.   Yes.

5    Q.   During the same interview, Detective Torres also asked you

6    how you got in contact with these guys?

7    A.   That is correct.

8    Q.   And you said you met them in Texas during a friend's

9    graduation party?

10   A.   That is correct.

11   Q.   And it is true that you did go to Texas to visit your

12   friend, Kuts US, in December of 2024?

13   A.   Yes.

14   Q.   All right.  And his name is Jones Lopez, as you said?

15   A.   Yes.

16   Q.   And you know him from India?

17   A.   Yes.

18   Q.   I believe you said he was your lifelong friend?

19   A.   Yeah, we grew up together in the same towns.  We went to

20   soccer camps together, same schools.

21   Q.   He also came to the United States to go to college?

22   A.   That is correct.

23   Q.   But he went to college at the University of Texas at

24   Arlington?

25   A.   That is correct.

SATHAWANE - CROSS

1   Q.   And you knew when you sat with Detective Torres that you

2   had communications with Bond and Alex prior to that trip, didn't

3   you?

4   A.   I did.

5   Q.   Your first communication with Alex was no later than

6   September 30th of 2024, correct?

7   A.   Correct.

8   Q.   Your first communication with Bond was October 1st of 2024,

9   correct?

10  A.   Correct.

11  Q.   Both of those communications occurred well before December?

12  A.   Yes.

13  Q.   So when Detective Torres -- when you told Detective Torres

14  that you first got into contact with these guys at a graduation

15  party in December, that was also a lie?

16  A.   Yes.

17  Q.    Kuts US, he's the one who got you involved in the gold

18  rushes.  You said that on direct.

19  A.   Yes.

20  Q.   And, in fact, you started talking to him about gold rushes

21  as early as August of 2024, didn't you?

22  A.   At that point, he didn't mention what it was.  He just said

23  I have a job for you.

24  Q.   Specifically, he said what the job was, which is to pick up

25  and drop off at a place, right?

SATHAWANE - CROSS

1    A.    Yes.

2    Q.    And then he asked you to call me later when alone?

3    A.    Yes.

4    Q.    And you did that?

5    A.    Probably.  I don't remember.

6    Q.    Well, then you discussed this specific job of picking up

7    and dropping off, didn't you?

8    A.    I did that before I got my call from Alex on 30th of

9    September.

10    Q.    Which was around August the 24th, '24, correct?

11    A.    September -- it was more October, closer to October,

12    September 30th.

13    Q.    What I'm saying is -- I'm not talking about when Alex or

14    Bond reached out to you.  I'm talking about when you

15    communicated with Kuts about the prospect of being a gold

16    rusher.

17    A.    At the moment, at that time, we didn't actually speak about

18    it.  Because I don't think we ever got to the point where I

19    agreed to do it.  I had my day job, and I was real busy because

20    I was doing six days a week.  So I'm like, yeah, I cannot do it

21    at this point.

22    Q.    Okay.  You didn't agree to begin doing it, but my question

23    is did you communicate with him about the prospect of doing it

24    at that time?

25            MS. CONTRERAS:  Asked and answered, Your Honor.

SATHAWANE - CROSS

1    THE COURT:  The objection's overruled.

2    You can answer the question.

3    THE WITNESS:  No, I don't think so.

4  BY MR. HAPNER:

5  Q.   You don't think so.

6    Okay.  Can we look at Report 21, please.

7    1424, please.

8    On August 1, 2024, Kuts US said, Bro, I have a job for

9  you, didn't he?

10 A.   That seems to be on the screen.

11 Q.   Okay.  And then below that, he said, Pick up and drop off

12 at a place?

13 A.   Yes.

14 Q.   And then you responded, I'll buy you condoms.

15 A.   Yeah.

16 Q.   And then he said LMAO.

17    And then you asked for clarification:  What are you

18 talking about when you refer to picking up and dropping off at a

19 place?

20 A.   Yes.

21 Q.   Okay.  And then after that, he says something in Hindi,

22 which was translated to mean call me later when alone?

23 A.   Yes.

24 Q.   He wanted you to be alone when you made that call, didn't

25 he?

1  A.   I believe at the time I was somewhere public.  That's why

2  he said call me when you're alone.

3  Q.   He knew you were in public, and he didn't want you to have

4  that conversation in public?

5         MS. CONTRERAS:  Objection, calls for speculation, Your

6  Honor.

7         THE COURT:  You can ask what his impression of what he

8  was getting at was.

9         MR. HAPNER:  I believe that was his testimony, that he

10  knew -- that he said, Well, I was in public.

11         THE WITNESS:  It's a metaphor.  Like, in the language,

12  that's how you speak, saying -- in English we say call me later.

13  It's just the way that we speak in Hindi.

14  BY MR. HAPNER:

15  Q.   All right.  Well, it doesn't say just call me later; it

16  says call me later when alone.

17  A.   That's what I'm saying.  It's a metaphor in Hindi.  That's

18  how the language goes.  You cannot just say call me later in

19  Hindi without saying back and forth.

20  Q.   Well, then why did you just try to explain it by saying you

21  were in public?

22  A.   As I said, it's been more than a year.  I cannot recall for

23  sure where I was, but that's my best guess.

24  Q.   Okay.  But this is still August 1st of 2024, right?

25  A.   That is correct.

SATHAWANE - CROSS

83

1   Q.   And then in response to him asking you to call him when

2   you're alone, you said "haan," which means yes?

3   A.   That is correct.

4   Q.   Okay.  Now let's talk about your multiple opportunities to

5   tell the truth in this case.

6            You recall -- and you mentioned in your direct that

7   you had opportunities to meet with law enforcement.  You said

8   you wanted to help us, right?

9   A.   That is correct.

10  Q.   And you recall we had two meetings to talk about what was

11  happening with these gold rushes?

12  A.   That is correct.

13  Q.   The first meeting was on March 4th, 2025?

14  A.   That is correct.

15  Q.   I was there.

16  A.   Yes.

17  Q.   Your defense counsel, Ms. Contreras, was there?

18  A.   Yes.

19  Q.   Detective Torres was there?

20  A.   Yes.

21  Q.   And there were also two Secret Service agents?

22  A.   Yes.

23  Q.   That meeting was over two weeks after your initial arrest

24  on February 13th?

25  A.   That is correct.

SATHAWANE - CROSS

1  Q.   So you had time to think about your prior answer to

2  Detective Torres?

3  A.   Not really because at the day when I was called for the

4  meeting, I was under the impression I was just meeting my lawyer

5  and not all of the law enforcement officers.  And I was still

6  recovering from the shock of what had happened, so.

7  Q.   You would agree with me that the meeting took place two

8  weeks -- at least two weeks -- after your initial arrest?

9  A.   That is correct.

10  Q.   During that meeting, you again told us that you were

11  brought into gold rushing after you traveled to Texas in mid

12  December of 2024, didn't you?

13  A.   That is correct.

14  Q.   You said you went to the club to celebrate, and that's when

15  you provided your contact information to several people?

16  A.   That is correct.

17  Q.   You said you did not recall the name of any individuals

18  that you met.

19  A.   That is correct.

20  Q.   That was not true.  That was a made-up story.

21  A.   I did go to Texas.  I did meet a lot of people.  I did make

22  new contacts.  So I just didn't meet Bond or Alex that day.

23  Q.   Right.  And that's also not when you were introduced to

24  gold rushing either.

25  A.   No.

SATHAWANE - CROSS

85

1    Q.    You had done many runs at that point.

2    A.    Yes.

3    Q.    And you did not tell us during that meeting that it was the

4    friend you were celebrating, Kuts US, that is the one who

5    introduced you to Alex and Bond several months prior, did you?

6    A.    That is correct.  I didn't want to drag him into this.

7    Q.    Then you again said you were contacted two to three weeks

8    later, shortly after Christmas.  You mentioned specifically the

9    word Christmas, right?

10   A.    Mm-hmm.

11   Q.    Which is in the end of December?

12   A.    Yes.

13   Q.    You said you were mentioned -- or you were contacted around

14   that time about the opportunity to do gold rushes, right?

15   A.    Yes.

16   Q.    And you specifically said again that the first time you

17   picked up a package was in January?

18   A.    That is correct.

19   Q.    Again, that was a lie?

20   A.    That is true.

21   Q.    You had already done many gold rushes at that time, as we

22   just saw.

23   A.    Yes.

24   Q.    You also said that you did 15 to 20 pickups total.

25   A.    I said I couldn't estimate that I did 15 to 20 pickups.  I

SATHAWANE - CROSS

1   wasn't sure how many I did.

2   Q.   Because you had done so many, you weren't sure?

3   A.   That's speculation.  Again, I just didn't recall at that

4   point.

5   Q.   Now you know you did over 30?

6   A.   That is correct.

7   Q.   Yash Patel was also with you when you went to Texas in

8   December, wasn't he?

9   A.   That is correct.

10  Q.   And when you were arrested in February of 2025, you knew

11  that Yash Patel had been doing gold rushes?

12  A.   He had done at least one.

13  Q.   You also knew that Kuts US was acting as a courier, which

14  you admitted today as well?

15  A.   I wasn't sure if he was still doing it, but yes.

16  Q.   Not still doing it; you know he had done it in the past.

17  A.   That is correct.

18  Q.   But in your first meeting with us, you said you do not know

19  anyone else who was acting as a courier?

20  A.   That is correct.  I didn't want to get my friends tied into

21  it.

22  Q.   So that was also a lie?

23  A.   Yes.

24  Q.   You also knew about Steve during that meeting, right?

25  A.   Yes.

SATHAWANE - CROSS

1   Q.   And, in fact, based on your communications with Bond, you

2   had Steve's phone number saved in your phone?

3   A.   It wasn't saved.  It was just a phone number.  It was just

4   a chat open.

5   Q.   You had -- when I say "saved," I mean you had had at that

6   point multiple WhatsApp conversations with Steve.

7   A.   That is correct.

8   Q.   You just testified about how many times you dropped off to

9   Steve because you thought he was a jeweler.

10   A.   Yes.

11   Q.   Right.  And so if you were to look in your phone, you can

12   see the number that you're communicating with for Steve?

13   A.   I think I did provide the number in the next proffer.  I

14   was the one who let you guys know about it.

15   Q.   I'm talking about the first proffer.  In the first proffer,

16   you did not mention the name Steve, did you?

17   A.   I don't believe so.

18   Q.   And whether or not you want to classify him as a courier,

19   at that time you knew he was involved because he was the

20   individual picking up the packages of gold and cash from you?

21   A.   That should be correct.

22   Q.   And you said earlier on direct examination that at that

23   time you had received a copy of the arrest report, and so you

24   knew then that there was some type of criminal activity afoot,

25   right?

SATHAWANE - CROSS

1   A.   That is correct.

2   Q.   So that's the first time you learned about this?

3   A.   That is correct.

4   Q.   So at that time, wouldn't it have been prudent of you to

5   tell us that the individual you're dropping off significant

6   amounts of cash and gold to was Steve because he -- now you know

7   that Steve's involved in criminal activity?

8            MS. CONTRERAS:  Objection, Your Honor.  It's a

9   narrative, and it -- wouldn't it have been prudent to know.

10  Calls for -- I mean, just calls for speculation.

11           THE COURT:  That is overruled.

12           You can answer the question.

13           THE WITNESS:  So at the moment, I didn't really have

14  any information about Steve, and bringing it seemed fruitless.

15  I know a whole bunch about Bliss Jewelry, and it was a physical

16  store that they would actually go into.  That's why I told you

17  guys about the Bliss Jewelry store and stuff.  Steve, because I

18  wasn't sure if that was useful information.  I don't even know

19  if Steve is his real name.

20  Q.   Didn't I tell you at the beginning of the proffer that it

21  wasn't your decision to pick and choose what's important.  You

22  have to tell us everything you have to know -- everything you

23  knew about this?

24  A.   I was blindsided by the meeting.  So I was in shock, I was

25  in panic.  I was just trying to defend myself.

1    Q.    From what?

2    A.    From you guys.  Because the first time Detective Torres

3    said you can only help yourself out.  He never answered any of

4    my questions.  I tried to be honest with him, but he never spoke

5    anything.  On the car ride to the PD, I was being treated like I

6    had done some -- like I was a really, really bad person.  I was

7    being pushed around.  So I just wasn't thinking straight at the

8    moment.

9    Q.    What, now you're saying that you were entirely truthful to

10   Detective Torres for that initial interview?

11   A.    I never mentioned that.  I never said that.

12   Q.    I thought that's what you just said, that you were trying

13   to be -- that you felt blindsided because you were originally

14   entirely truthful to Detective Torres.

15   A.    I did not say that.  I just said I was blindsided by the

16   meeting.

17   Q.    Okay.

18   A.    I did not know if I was meeting you guys.

19   Q.    Maybe I misunderstood.

20         You would agree with me you didn't mention Steve

21   during the first meeting with us?

22   A.    That is correct.

23   Q.    You also didn't mention Bond's family member.

24   A.    That is correct.  I didn't recall him until the day I saw

25   the report that you had combined, and that's the day I recall

SATHAWANE - CROSS

1  most of the transactions.

2  Q.   All right.  And --

3  A.   I believe in the second proffer I did say that if you could

4  show me the days or the places, I could be more helpful with it.

5  Q.   All right.  So let's talk about that second proffer now.

6           So that took place later, in July of 2025, right?

7  A.   Yes, that is correct.

8  Q.   Again, I was there.

9  A.   Yes.

10  Q.   Your defense counsel, Ms. Contreras, was there.

11  A.   Yes.

12  Q.   Detective Torres was there.

13  A.   Yes.

14  Q.   And this time Agent Wisnaskas was there.

15  A.   Yes.

16  Q.   And I emphasized the importance of telling the truth to you

17  at the beginning of that meeting.

18  A.   Yes.

19  Q.   In that meeting, you did admit for the first time that Yash

20  Patel and Kuts US were couriers.

21  A.   That is correct.

22  Q.   And then I asked you directly if you knew any other

23  couriers.

24  A.   That is correct.

25  Q.   And you said no.

SATHAWANE - CROSS

1  A.   That is correct.

2  Q.   And then I very directly asked you if you knew Robert

3  De Niro was also a courier?

4  A.   That is correct.

5  Q.   I asked you multiple times about him.

6  A.   Yes, that is correct.

7  Q.   And you denied knowing that he was a courier.

8  A.   That is correct.

9  Q.   And do you still deny to this day that he was a courier?

10 A.   That is correct.

11 Q.   That is correct, you --

12 A.   I deny it.

13      MR. HAPNER:   Okay.   Can we please see report 15.

14 BY MR. HAPNER:

15 Q.   This is your conversation with Roberto De Niro?

16 A.   That is correct.

17 Q.   Mr. Navarrete.

18 A.   It is a group chat, but, yes, that is correct.

19 Q.   Okay.   Yash Patel is also involved in this?

20 A.   Yes.

21      MR. HAPNER:   Can we turn to page 27, 2776, please.

22 BY MR. HAPNER:

23 Q.   And if we scroll down here, there is a picture sent by

24 Robert De Niro on February 9th of 2025, correct?

25 A.   That is correct.

SATHAWANE - CROSS

1  Q.   And this is a screenshot of a map from --

2  A.   That is correct.

3  Q.   -- from his vehicle?

4  A.   That is correct.

5  Q.   All right.  And this is similar to the type of maps that

6  you have to send to Bond and Alex every 20 minutes when you were

7  involved in gold rushing, right?

8  A.   That is correct.

9          MR. HAPNER:  And can we see the next message.

10 BY MR. HAPNER:

11 Q.   Robert De Niro says what?

12 A.   Starting the gold rush.

13 Q.   So --

14 A.   If you scroll below it or above it, you'd see he's going to

15 his parents, and maybe he just mentioned it as a joke.  And

16 because at that point he knew me and Yash both were doing this,

17 so he was just messing around.  You can look at the context

18 below.

19 Q.   Can we go down just a little bit?

20 A.   Look at that.

21 Q.   You laughed at it, and then you told him to drive safe.

22 You said too many retards are on the street?

23 A.   That is correct.

24          MR. HAPNER:  And sorry.  Can we keep going.

25          Keep going, please.

1    BY MR. HAPNER:

2    Q.   I'm not seeing any reference to any jokes about this, that

3    he's not, in fact --

4    A.   It was all about being jokes.  You see this -- like, if you

5    go up --

6    Q.   Well, now here's you talking about cops on the street after

7    he mentioned --

8    A.   And Chiefs getting their ass handed to them.  That was, I

9    believe, the Super Bowl, and he was going to his parents' house.

10   Q.   All right.  Let's switch gears.

11        Let's talk about the individuals who were coordinating

12   these gold rushes.  One of them was Alex?

13   A.   Yes.

14   Q.   You thought Alex lived in Chicago?

15   A.   That is correct.

16   Q.   But Alex is also from India?

17   A.   Yes.

18   Q.   And he also speaks Hindi?

19   A.   Yes.

20   Q.   While you were communicating with Alex about the gold

21   rushes, he kept switching names and phone numbers, didn't he?

22   A.   That is correct.

23   Q.   He went by Alex Dmong?

24   A.   That is correct.

25   Q.   He went by Sergio?

SATHAWANE - CROSS

1    A.    That is correct.

2    Q.    And was he also Ramos and Razor?

3    A.    That is correct.

4    Q.    What is Alex's real name?

5    A.    I believe it's Pratham Shah.

6    Q.    Pratham, staring with a P?

7    A.    With a P.

8    Q.    Okay.  P, as in Paul?

9    A.    That is correct.

10   Q.    R-A-T-H.

11   A.    A-M.

12   Q.    Okay.  When did you first learn that?

13   A.    I think sometime November, I want to say, or something --

14   something like that.  I think Jones was the one who mentioned it

15   to me.

16   Q.    November of what year, 2024?

17   A.    2024.

18   Q.    Okay.  And you didn't mention that in your interview with

19   Detective Torres, did you?

20   A.    I did not recall it at that point.

21   Q.    The other person you were working with was Bond?

22   A.    That is correct.

23   Q.    He was the one -- his role was the one who told you where

24   to go to pick stuff up and drop stuff off?

25   A.    That is correct.

SATHAWANE - CROSS

1    Q.    And you believed he was working from India?

2    A.    That was my speculation, yes.

3    Q.    And he -- well, he communicated with you in Hindi, right?

4    A.    That is correct.

5    Q.    You talked to Bond regularly over the course of the gold

6    rushes?

7    A.    Mm-hmm, yes.

8    Q.    Both in the WhatsApp messages and phone calls?

9    A.    Yes.

10   Q.    Almost every other day?

11   A.    Yes.

12   Q.    And sometimes for hours per day?

13   A.    You can say that, yes.

14   Q.    Bond also kept switching numbers during this time?

15   A.    Yes.

16   Q.    He kept switching names during this time as well?

17   A.    Yes.

18   Q.    He went by 007?

19   A.    Yes.

20   Q.    He went by Spectre Bond?

21   A.    Yes.

22   Q.    You know those are not his real names, right?

23   A.    I mean, those are synonyms, but, yes, I understand what

24   you're saying.  Yes.

25   Q.    Synonyms for what?

SATHAWANE - CROSS

1    A.    Bond, James Bond.

2    Q.    You know about the James Bond movie, right?

3    A.    Yes.

4    Q.    Right.  So you know that this individual you're

5    communicating with, you're primarily -- the person who's

6    primarily coordinating all these pickups and drop-offs is using

7    a fictional alias from a movie character?

8    A.    That is correct.

9    Q.    And you never actually saw his face?

10   A.    No.

11   Q.    You said that he -- whenever you had a video call, he

12   wouldn't even turn on his screen.

13   A.    That is correct.

14   Q.    Do you know Bond's real name to this day?

15   A.    No.

16   Q.    And so you're telling me that in all these communications

17   you had with him for about four and a half months of doing gold

18   rushes almost every day, you never found out his real name?

19   A.    No.

20   Q.    You admitted on your direct examination and with your

21   interview with Detective Torres that you were suspicious after a

22   couple runs; is that right?

23   A.    That is correct.

24   Q.    And you said that the first time you mentioned this after

25   the couple runs was -- let me rephrase that.

SATHAWANE - CROSS

1          You were suspicious after a couple of runs, and at

2     that time when you reached out to them, you said that they told

3     you, We don't know what's happening, we only do logistics,

4     right?

5     A.    That is correct.

6     Q.    Who was them that you're referring to?

7     A.    Bond and Alex.

8     Q.    You spoke to both of them?

9     A.    I believe one of them at least.  I cannot be sure.

10    Q.    You don't remember who you spoke to?

11    A.    I might -- that's what I'm saying.  I don't remember for

12    sure which one it was, but it was one of them.

13    Q.    Okay.  I mean, that was a pretty important call, right?

14    You said you're suspicious, and now you're trying to get your

15    suspicions -- you're trying to dispel your suspicions so you can

16    know whether or not you should continue doing these gold rushes,

17    but you don't remember who you talked to?

18    A.    At that point, no one even knew each other, so everyone was

19    not saying everything.  They were not as open.  But by the time

20    I asked them the next time, they were more transparent about it.

21    So it worked out, and I never figured -- like, I never tried to

22    think back at it.

23    Q.    Okay.  Let's talk about the next time.

24          So you testified on your direct that later when you

25    went to New Jersey to do these gold rushes --

SATHAWANE - CROSS

1   A.   Yes.

2   Q.   -- you were suspicious again?

3   A.   No, I was tired of waiting because they were like, Hey,

4   it's going to come in, come in, come in.  I was in a new state I

5   didn't know, and I asked them like, Hey, what is this really

6   about?  Like, why am I here and not doing anything?

7   Q.   And then they told you, actually, we do know what's going

8   on, and it's off-market gold trading; is that right?

9   A.   That is correct.

10  Q.   And who told you that?

11  A.   That is Bond.

12  Q.   That was Bond?

13  A.   Yes.

14  Q.   Okay.  And so you trusted Bond when he told you that?

15  A.   That is correct.

16  Q.   A person who's not in the United States.

17  A.   Yes.

18  Q.   Who's using the names of a fictional character.

19  A.   I mean, I'm named after Toy Story's Andy, so it's just

20  nicknames you go by.

21  Q.   You thought the alias was his nickname?

22  A.   Yeah.

23  Q.   Okay.  He also was -- you trusted him, the person who was

24  regularly switching phone numbers?

25  A.   Yes.

1    Q.    Who would not show his face on your video calls?

2    A.    I mean, the video calls were not about talking to each

3    other.  They were like where you find the objects -- or the

4    contents of the box.  That's it.

5    Q.    And he was the one that was telling you to switch chat

6    groups and delete messages?

7    A.    That is correct.  He was adding me to new groups and saying

8    delete the old one.

9    Q.    But that's who you trusted when he gave you that answer?

10   A.    That is true.

11   Q.    And you said you were -- so you didn't want to use the word

12   suspicious.  You said you wanted to know what was happening

13   because of the delay, so let's talk about that.

14          You flew up to New Jersey -- I don't remember the

15   exact day, but you would agree with me that after you did that,

16   there was at least three or four days where nothing happened,

17   you did not do any gold rushes?

18   A.    That is correct.

19   Q.    During that time frame, though, there were numerous

20   communications with you where Bond would send a zip code, and

21   then you would respond with a map, correct?

22   A.    That is correct.

23   Q.    All right.  And yet nothing was confirmed?

24   A.    That is correct.

25   Q.    All right.  So during that trip, wasn't it strange to you

SATHAWANE - CROSS

1   that you think you're involved in a legitimate off-market gold

2   trading venture and they're sending you out of state, and yet

3   there's no jobs to do for four days?

4   A.   That's why I asked him, like, what was happening, and

5   that's why -- I think that's why he actually came up to me and

6   said that, oh, this is what's happening and that's why you're

7   there.  We're just waiting for something to confirm.

8   Q.   All right.  Let's talk a little bit more about your job as

9   a gold rusher.

10          Did you consider Bond or Alex to be your boss?

11  A.   That is true.

12  Q.   What is the name of the company that Bond worked for?

13  A.   I don't know.

14  Q.   What is the name of the company that Alex worked for?

15  A.   I don't know.

16  Q.   What is the name of the jewelry store that Steve worked at?

17  A.   I have no idea.

18  Q.   What kind of documents did you sign to start working with

19  them?

20  A.   It was just said -- like, that was how I was working at my

21  UPS store as well.  I wasn't on paper.  I was working under the

22  table.

23  Q.   Did you have an interview?

24  A.   I had a phone call.

25  Q.   With who?

1    A.    With Bond.  I think -- Alex, I think that was the first

2    call that I had.

3    Q.    Since you were driving such significant distances all over

4    the state, what type of driver safety courses did you have to

5    pass?

6    A.    I have my driver's license and my insurance.  That's it.

7    Q.    You didn't have to take any type of courses to prove you

8    were a safe driver?

9    A.    No.

10   Q.    Did you have to provide any records to show that you were a

11   safe driver, that you don't have a history of traffic

12   violations?

13   A.    Not per se, but they know there were -- aware of my traffic

14   violations because I had a bunch of tickets at the time.  So I

15   did tell them because I had to go to arraignment stuff.

16   Q.    So they knew you had a bunch of speeding violations, and

17   they were still okay with bringing you in as a driver?

18   A.    That's why they were all concerned and kept stabbing me,

19   don't speed, don't speed.

20   Q.    What kind of training did you get to ensure the safety of

21   the significant amounts of money and property while you were

22   doing the gold rushes?

23   A.    None.

24   Q.    You said that -- you said yourself you were worried about

25   getting robbed, right?

SATHAWANE - CROSS

1   A.   That is correct.

2   Q.   And you even thought about carrying a firearm?

3   A.   That is correct.

4   Q.   But then there's a reference in one of your communications

5   that if you did that, you knew for sure you would get arrested?

6   A.   That is a felony to possess a firearm without a permit.

7   Q.   That's what you thought at that time?

8   A.   I believe that is it.  No?

9   Q.   In the state of Florida?

10  A.   It's not?  I don't think I can own it.  I was on a visa.

11  Q.   Oh, okay.

12  A.   I'm not sure what the law is, but that's what I believe.

13  Q.   If this was a legitimate investment company, what kind of

14  background check did you do to confirm that you were of

15  sufficient moral character not to steal the significant amount

16  of money and property?

17  A.   That was the reason, actually, the first couple runs they

18  were constantly harassing me.  They were constantly on phones

19  with me to make sure I was on the road.  But if you see as we

20  progress, they stopped doing it.  The frequencies went lower, so

21  they started trusting me.

22  Q.   I don't think that answered my question.  My question is

23  did you have to do a background check?

24  A.   I don't believe so.  They asked me where I'm from, what I'm

25  doing, and I think that was it.

SATHAWANE - CROSS

1   Q.   And they basically trusted you on your word and the word of

2   another college student, Kuts US?

3   A.   That is correct.

4   Q.   You were going to -- you were at least thinking about

5   stealing the money at some point, right?

6   A.   It was meant as a joke because I had that much with me, so

7   it was just greedy curiosity I would say.

8   Q.   What was meant as a joke?

9   A.   The conversation of me saying, oh, I could steal it all, I

10  could get away with it.

11  Q.   You're talking about the conversation you had with Yash

12  Patel?

13  A.   That should be the one.

14  Q.   Where you said that if you wanted to --

15  A.   If you know what I mean.

16  Q.   I'm sorry?

17  A.   It's one gold rush, if you know what I mean.

18  Q.   Right.  It's -- you're talking about a $60,000 vehicle, a

19  Corvette?

20  A.   That is correct.

21  Q.   And then Yash said, Well, it's three months of gold rushes.

22  A.   That is correct.

23  Q.   And you said, It's one gold rush, if you know what I mean.

24  A.   That is correct.

25  Q.   And then he responded, The last one?

SATHAWANE - CROSS

1    A.    Huh?

2    Q.    And he responded laughing -- LMAO.  That's also true, the

3    last one.

4    A.    Yes, that is correct.

5    Q.    And by this, we're clearly implying that if you pick up a

6    significant amount of cash or gold from an elderly victim and

7    then you don't transfer it to these people that you claim are

8    operating jewelry stores, you knew that they -- and if you kept

9    it for yourself, you knew that they would no longer engage you

10   to continue being a courier, so that's why it would be the last

11   run for you?

12   A.    No, the last one meant -- the last message that I sent, so

13   me saying that, "if you know what I mean," that's what he

14   reacted to "by the last one."

15   Q.    But that is what you meant, and now you're saying it's a

16   joke?

17   A.    Okay.  You are speculating.  Can you go back again?

18   Q.    Yash said, You mean it's three months of gold rushes.  And

19   you said, It's one gold rush, if you know what I mean.

20   A.    That's correct.

21   Q.    Right.  You were never paid $60,000 for one gold rush, were

22   you?

23   A.    No.

24   Q.    You were referring to taking the money or property that you

25   were supposed to be delivering to other people?

SATHAWANE - CROSS

1    A.    That is correct.  That's -- that's...

2    Q.    All right.  We talked about this a little bit, but I just

3    want to clarify.  So you mentioned that you thought this was all

4    off-market gold trading?

5    A.    That is correct.

6    Q.    And I believe you even said that it was to evade taxes?

7    A.    That is correct.

8    Q.    So is it your testimony here today in federal court you

9    thought you were helping these individuals commit tax evasion?

10   A.    That is correct.

11   Q.    And what is off-market gold trading?

12   A.    Just not reporting capital gains to the government.

13   Q.    Well, you picked up cash.  That's not gold trading.

14   A.    They're buying at this point.  Trading is buying and

15   selling.

16   Q.    Oh, so you thought when the individuals were handing you

17   significant amounts of cash they were buying gold?

18   A.    Yes.

19   Q.    Did you --

20   A.    That's correct.

21   Q.    Whenever you picked up cash, name one time that you also

22   gave that person a box of gold.

23   A.    I figured there was different couriers doing it.

24   Q.    Is it -- am I correct that never on one occasion did you --

25   when you received cash from an elderly victim, did you then

SATHAWANE - CROSS

1    transfer them gold?

2    A.    No.

3    Q.    You never left anything with any of these victims, did you?

4    A.    No.

5    Q.    You thought that -- you thought that this was some type of

6    investment opportunity for them?

7    A.    Not per se.  I thought either they were getting money from

8    it or they were selling their gold.

9    Q.    What do you mean getting money from it?

10   A.    By selling gold or get - pawning it as a loan.

11   Q.    You thought these were people with a lot of money?

12   A.    Yes.

13   Q.    Right.  And you even referred to it as "white people money"

14   to your friend Roberto?

15   A.    Again, that was -- that is being taken under false

16   pretenses, I would say, because what I meant by that is it's

17   just clean money, it's not dirty money.  It's not drug money or

18   something.  That is what I meant by the statement.

19   Q.    And for some of these people, you thought they were trying

20   to make these gold transfers or cash transfers as a form of like

21   a financial investment, financial transaction, right?

22   A.    They were liquidating themselves is what I could figure

23   out, maybe buying a house.

24   Q.    Did you view these people as like savvy investor types?

25           MS. CONTRERAS:  Objection --

1        THE WITNESS:  I mean, they were living in good --

2        MS. CONTRERAS:  -- calls for speculation.

3        THE COURT:  It does not call for speculation.

4   That's -- he's asking about his perception, and the objection's

5   overruled.

6        You can answer the question.

7   BY MR. HAPNER:

8   Q.   Did you view the individuals you were picking up the cash

9   or gold from as savvy?

10  A.   How would you define the word savvy?

11  Q.   Well, you wouldn't say that you thought that these people

12  who had acquired significant amounts of cash and money that were

13  now working with you to do these financial transactions, you

14  would not call them stupid, right?

15  A.   That is correct.

16  Q.   Then why did you call Ms. Goodwin retarded?

17  A.   Who?

18  Q.   Do you remember Ms. Goodwin who testified yesterday, the

19  87-year-old woman from The Villages?

20  A.   What did I say?

21  Q.   Well, first of all, you told her your name was David.

22  A.   I don't think it was me who told her David, but if it's on

23  the record, I -- I cannot recall.

24  Q.   What do you mean if it's on the record?

25  A.   I do not remember if it was me who said that my name is

1   David, because they usually let them know.  I just knew the

2   passwords, and I used to say the passwords.  That's it.

3   Q.   Okay.  Well, Ms. Goodwin testified very clearly that there

4   were -- the two separate things that occurred when she met you.

5   One is the first thing she said was, I asked:  What is your

6   name?  And you replied David.  And then she separately testified

7   that you gave a passcode which was "green Chevy."

8   A.   Mm-hmm.

9   Q.   Are you denying that you told Ms. Goodwin that your name is

10  David?

11  A.   I think I just --

12          MS. CONTRERAS:  Your Honor --

13          THE WITNESS:  -- don't recall.

14          MS. CONTRERAS:  -- he's misrepresenting the testimony.

15  He didn't deny it.  He said he doesn't remember.

16          THE COURT:  The question is does he deny it.  The

17  objection's overruled.

18          You can answer the question.

19          THE WITNESS:  I don't recall.

20  BY MR. HAPNER:

21  Q.   Okay.  So you can't say one way or the other whether

22  Ms. Goodwin -- you have no reason to question Ms. Goodwin's

23  testimony because you don't recall?

24  A.   Yeah.

25  Q.   All right.  And do you deny calling her a retard with STDs

1    after you picked up her gold?

2    A.   Yes, that is correct.

3    Q.   Correct, that you deny that statement?

4    A.   That is correct.  It wasn't meant for her.  It was just a

5    group of -- it is the running -- as you and me both know,

6    running joke in The Villages.

7              MR. HAPNER:  Can we look at Report 15, page 2099.

8    BY MR. HAPNER:

9    Q.   All right.  So this is a conversation with you and your

10   buddies Roberto and Yash?

11   A.   That is correct.

12             MR. HAPNER:  And if we could scroll down a little bit.

13   2099.

14             Sorry.  I think we're on the wrong page.

15   BY MR. HAPNER:

16   Q.   All right.  It starts on this day, January 16th in 2025.

17             And actually, before we go any further, the

18   transaction with Ms. Goodwin is on January 16, 2025.  Do you

19   have any reason to question that, sir?

20   A.   No.

21   Q.   So in this conversation, Roberto De Niro asks you, Do any

22   gold rush today, right?

23   A.   Mm-hmm.  That is correct.

24   Q.   You respond that you're on the way back.

25   A.   Yes.

SATHAWANE - CROSS

1    Q.    Yash then enters the conversation and says, Did you already

2    do a token?

3    A.    Yes.

4    Q.    You said yee.

5    A.    Yes.

6    Q.    And then you explained that Orlando was the token.

7    A.    Yes.

8    Q.    You remember that Ms. Goodwin lived in The Villages.

9    A.    Yes.

10   Q.    So you said it was The Villages pickup.

11   A.    Yes.

12   Q.    And then you said, Retards with STDs on golf carts.

13   A.    Not if you scroll down.  You should see the replies on it

14   as well.  Because --

15   Q.    Okay.

16   A.    -- The Villages are the STD capital of Florida.  So it's a

17   known fact.  We were just messing around.  This is a group chat.

18   It's my safe space.

19   Q.    You agree with me that you made that statement referring --

20   immediately after referring to the gold rush that you did with

21   Ms. Goodwin in The Villages?

22   A.    That is correct.

23   Q.    And you're saying it wasn't directed at her personally,

24   right?

25   A.    It's just The Villages that's mentioned.  I never mentioned

SATHAWANE - CROSS

1  the lady from The Villages.

2  Q.   All right.  So you're --

3  A.   It's just a common area, general area.

4  Q.   So you're generally familiar with The Villages?

5  A.   I know about it.  I've heard about it.

6  Q.   And you heard that there's a high rate of STDs at The

7  Villages?

8  A.   That is correct.

9  Q.   And you knew apparently that a lot of people in The

10  Villages drive golf carts?

11  A.   That is correct.

12  Q.   And you must also know that a lot of elderly people live

13  there.

14  A.   I do not know that.

15  Q.   Is it your view that all the people in The Villages are

16  retards with STDs?

17  A.   No.

18        MS. CONTRERAS:  Objection, Your Honor.  Relevance,

19  403.

20        THE COURT:  That's sustained.  Let's move on.

21  BY MR. HAPNER:

22  Q.   You did many of the transactions with Bliss.  Let's go back

23  to that for a second.

24        Can we go to Exhibit 58, page 28, please.

25        So this is a situation where you're saying that you're

1    dropping it off to a legitimate jeweler, right?

2    A.    That is correct.

3    Q.    And yet in this situation, if we highlight the bottom

4    right-hand corner, you take this gold, you deliver it to

5    somebody who's in the jewelry store.

6    A.    Mm-hmm.

7    Q.    And you're not paid any money.

8    A.    That is correct.

9    Q.    All right.  And then can we look at page 32.  I'm sorry,

10    the transaction -- this is right, actually.  Transaction 31.

11        All right.  So you testified earlier that this is also

12    a transaction with Bliss Jewelry because it took place near the

13    Red Robin restaurant?

14    A.    That is correct.

15    Q.    All right.  Another situation where you're dropping it off

16    with a legitimate jeweler at their establishment, and yet you're

17    not paid anything for that transaction?

18    A.    That is correct.

19    Q.    And then if we could turn the page to the next one.

20        Another situation where you're told to go in the store

21    to Bliss Jewelry, and you are not paid anything for that

22    transaction, right?

23    A.    That is correct.

24    Q.    But you thought these were legitimate transactions with the

25    jewelry store?

SATHAWANE - CROSS

1    A.    That is correct.

2    Q.    Did they not have any cash on hand or any way to pay you as

3    a result of these drop-offs?

4    A.    They just let me know that we'll do it next time.  If you

5    see, it says 1600 due.  And they always followed up, so I had no

6    reason to question it.

7    Q.    For none of these transactions when you went in there, did

8    you get any type of paperwork from the business?

9    A.    No, except the dollar bill.

10   Q.    The dollar bill's the only thing?

11   A.    That is correct.  I'm just a courier, so it wasn't my

12   paperwork to collect.

13            MR. HAPNER:  All right.  And then if we could look at

14   page 18, please.

15   BY MR. HAPNER:

16   Q.    So transaction 17, again we're here at Bliss Jewelry, and

17   this is a situation where you're picking up both gold and cash

18   and dropping it off to the jewelry store, and you're going into

19   the establishment, right?

20   A.    That is correct.

21   Q.    And then but for this one, you're actually taking --

22            If we highlight this part.

23            The only time you're paid for this transaction with

24   Bliss Jewelry is you're talking almost $2,000 from the,

25   quote/unquote, investment money?

SATHAWANE - CROSS

1    A.   That is correct.

2    Q.   Or as you would say, it is the money that these individuals

3    were using to pay for gold that they would somehow receive in

4    the future?

5    A.   That was my guess, yes.

6    Q.   And that was legitimate to you?

7            MS. CONTRERAS:  Objection, Your Honor.

8            THE WITNESS:  I mean, you pay for shipping when you

9    buy stuff.

10           MS. CONTRERAS:  It's been asked so many times.  It's

11   been answered so many times too.

12           THE COURT:  The objection is asked and answered?

13   It's --

14           MS. CONTRERAS:  Yes.

15           THE COURT:  That's overruled.

16   BY MR. HAPNER:

17   Q.   All right.  Let's talk about hawala.  You mentioned that

18   earlier.  That's an informal currency exchange system?

19   A.   That is correct.

20   Q.   Have you participated in hawala transactions in India where

21   you lived?

22   A.   That is correct.

23   Q.   Tell me about the transactions that you participated in.

24   A.   Before coming to the States, I had acquired $1500, and we

25   had to get the currency exchange, so we had to give Indian

```
1    rupees equal value to 1500 to the jeweler, and he then called us
2    after two days to come collect it.
3    Q.   How did you know to go to that particular jeweler?
4    A.   Huh?
5    Q.   How did you know to --
6    A.   It's fairly common knowledge.  Like, you always know who's
7    the jeweler in the area who usually has this currency, or they
8    refer you to the other one.
9    Q.   And those are referred to as hawaladars?
10   A.   They just say -- yeah, hawala.  Like, it's not said used
11   term, but yeah, that is true.
12   Q.   Those are people with typically businesses -- established
13   businesses in the community?
14   A.   That is correct.
15   Q.   And established relationships in the community?
16   A.   You could say so.
17   Q.   Right.  Well, I mean the whole point of hawala is that is
18   an informal system based on trust and personal relationships,
19   correct?
20   A.   That is correct.
21   Q.   And in this case, you did not know any of the people you
22   picked up gold or cash from?
23   A.   That is correct.
24   Q.   They didn't know you?
25   A.   That is correct.
```

1   Q.   You barely talked to them?

2   A.   I mean, my job was just picking up and delivering it.  So

3   why would I have to know them?  I wasn't hawaladar.

4   Q.   I'm just asking you because you said that this is --

5   these -- you thought that these were hawala transactions, and

6   you have no relationship whatsoever with any of these people.

7   A.   The people were trusting me with their packages.  That's

8   why they were handing it to me.

9   Q.   The people trusted you, but you had never met them before?

10  A.   That is correct.

11  Q.   And in some cases you didn't even help them carry the heavy

12  boxes of gold to your car?

13  A.   I was in my car.  I was just approaching them.

14  Q.   Right.  You were in your car.

15  A.   I had no idea if they needed help.

16  Q.   You never even got out of your car to talk to them.

17  A.   No.

18  Q.   And you also barely knew Bond and Alex.

19  A.   I didn't hear you.

20  Q.   I'm sorry?

21  A.   I did not hear you.

22  Q.   You barely knew Bond and -- you didn't know Bond at all,

23  right?

24  A.   Yes.

25  Q.   And then you think you knew Alex's name, but you didn't

SATHAWANE - CROSS

1    really know him either.

2    A.    I mean, I knew about the lies, but if you say if I knew

3    them in person, I did not.  I know what they were doing on the

4    day because they shared that with me on calls, but.

5    Q.    All right.  And in your interview with Detective Torres on

6    the day you were arrested, you didn't mention the word "hawala,"

7    did you?

8    A.    No.

9    Q.    In the first meeting when law enforcement and myself and

10   your attorney met with you, you didn't mention the word

11   "hawala," did you?

12   A.    No.

13   Q.    In your second meeting in July when you met with myself and

14   your attorney and law enforcement, you did also not mention the

15   word "hawala," did you?

16   A.    That is correct.  I had mentioned tax evasion already.  So.

17   Q.    All right.  I want to talk now more about the payments that

18   you got for doing these gold rushes.

19              Could we look at Exhibit 55.

20              All right.  And we can just scroll --

21              You remember this exhibit that Agent Wisnaskas went

22   over, the summary of the payments you received?

23   A.    Yes.

24   Q.    All right.  And if we scroll down to the bottom.  All

25   right.

SATHAWANE - CROSS

1    The total figure that he came out with was 33,840,

2    correct?

3    A.   That is correct.

4    Q.   Now to be fair, I recognize that some of this money that

5    you received was also to make -- was also to pay for your

6    expenses, for example, when you travel?

7    A.   That is correct.

8    Q.   And then some of it was money that was given to you to make

9    Zelle payments to other people, right?

10   A.   It was just one instance.

11   Q.   Okay.  Just one time.  But you would agree with me that you

12   did not have over $20,000 in Zelle payments and travel expenses

13   during this whole time frame, right?

14   A.   You said you did not have or you do have?

15   Q.   You would agree with me that you did not have over $20,000

16   in Zelle payments and travel expenses during that time, right?

17   A.   That is correct.

18   Q.   And you would agree with me that even though some of it was

19   intended to reimburse you, you did receive $33,840?

20   A.   That is correct.

21   Q.   All right.  And in your first meeting with us in March,

22   isn't it true you said you made between 8,000 and $9,000 picking

23   up and delivering packages?

24   A.   I said I couldn't be sure how much I did.

25   Q.   All right.  Well, that figure is far different than 33,000.

SATHAWANE - CROSS

A.    Yes.

Q.    And you mentioned only one of that -- only a little bit of
that was for one Zelle payment, and then I think you had $2,000
of expenses from your flights.

A.    Yes.

Q.    Okay.  So that was not true that --

A.    I was just staying consistent with what I had said until
that moment, so.

Q.    It was not true that you made between 8,000 and $9,000
picking up and delivering packages, correct?

A.    That is correct.

Q.    You would agree with me that almost all of these payments
were in cash?

A.    That is correct.

Q.    I think I only saw two transactions where you were paid in
Zelle, right?

A.    I would believe so.

Q.    Is that fair, one or two or maybe three?

A.    Yeah, I wouldn't know total amount, but, yeah, something
like that.

Q.    You didn't have a direct deposit set up with Bond or Alex,
right?

A.    No, that's correct.

Q.    You were paid by the people who picked up the gold or cash
from you in the parking lots?

SATHAWANE - CROSS

```
1   A.    Yes.
2   Q.    You were always paid at the end of the run, unless there
3   was some type of issue?
4   A.    Yes.
5   Q.    Like in the example where you kept the cash at home for
6   several days?
7   A.    Yes.
8   Q.    You didn't have any type of biweekly pay structure or
9   anything like that?
10  A.    No.
11  Q.    And in general, you never got a check, you never got a pay
12  stub, anything like that?
13  A.    No.
14  Q.    What was the source of your payments?  Where did you think
15  that money was coming from?
16  A.    For the shipping?
17  Q.    For your job as a gold rusher.
18  A.    That is correct.
19  Q.    I'm sorry?
20  A.    Yeah, that is correct, from my job as a gold rusher.
21  Q.    Well, where?  Like, who was paying you?
22  A.    The guy who's receiving it.
23  Q.    Okay.  You thought the people that -- the jewelers --
24  A.    Yeah.
25  Q.    -- are the ones that were paying you?  Okay.
```

1  A.   Because they were the ones who were paying me when they got

2  gold, and when I had cash, they were just taking it out of the

3  cash.

4  Q.   But with the exception of the few times you talked to Steve

5  about the arrangement of where to transfer the cash or gold, you

6  weren't communicating with the jewelers about these

7  transactions, were you?

8  A.   It was Bond who already had everything set.

9  Q.   Because you were communicating with Bond or Alex about it?

10  A.   That is correct.

11  Q.   And then you were being paid by other people?

12  A.   That is correct.  Because they was the one who were setting

13  up the deals.

14         MS. CONTRERAS:  Your Honor, may we approach?

15         Actually, I can just say it out.  I think we've been

16  going for a little while, and I would like to ask for a break

17  for the defendant.

18         THE COURT:  Okay.

19         How much longer do you have?

20         MR. HAPNER:  Maybe 15 minutes.

21         THE COURT:  Okay.  We can -- we'll keep going.  Is

22  everybody good on the jury?

23         THE JURY:  (Nodding heads.)

24         THE COURT:  Okay.

25  ///

SATHAWANE - CROSS

```
1   BY MR. HAPNER:
2   Q.   And again -- I'm sorry.  What was your explanation for why
3   it was acceptable for you to obtain cash that you thought these
4   people were transferring to the jewelers?
5   A.   I mean, it was a shipping cost is what I figured out.
6   Q.   But on your direct examination, you said you never kept
7   packages, it was not your package to keep, and that you did not
8   want to mess that up.
9   A.   Exactly.  I never kept a package.  I always had them
10  delivered.
11  Q.   That's right.  You didn't keep the package, but you kept
12  the proceeds in the package?
13  A.   It was my payment.
14  Q.   All right.  After you received the cash, you either
15  deposited in your bank account or you spent it, right?
16  A.   Yes.
17  Q.   And when you were working at UPS, you were always paid in
18  Zelle?
19  A.   That is correct.
20  Q.   Zelle is an application that's linked to your bank account?
21  A.   That is correct.
22  Q.   And during this time frame, the Zelle was specifically
23  linked to your Chase account?
24  A.   That is correct.
25  Q.   And the payments you received from UPS were in the name of
```

SATHAWANE - CROSS                    123

1    DJP Fowler?

2    A.    That is from my UPS job.  That is correct.

3    Q.    Right.  And whenever you received a payment from working at

4    UPS, there would be a record of that transaction in your Chase

5    Bank account?

6    A.    That is correct.

7    Q.    And the Chase Bank account was in your own name?

8    A.    That is correct.

9    Q.    You didn't share that with anybody else?

10   A.    No.

11   Q.    All right.  And this was occurring even before you started

12   doing the gold rushes, right?

13   A.    That is correct.

14   Q.    But when you did the gold rushes, you preferred to be in

15   cash -- be paid in cash?

16   A.    That is correct.

17   Q.    And, in fact, you expressly said you did not want to be

18   paid in Zelle.

19   A.    That is correct.

20   Q.    All right.  Isn't it true that the reason you didn't want

21   to be paid in Zelle is because you didn't want there to be some

22   type of financial record of you participating in these

23   transactions?

24   A.    Not true.

25   Q.    You also made Zelle payments to other couriers.

SATHAWANE - CROSS
124

1   A.   Just one.  I was under the impression he was in ER.  He

2   needed the money.

3            MR. HAPNER:  Can we see Exhibit 19B, please.

4   BY MR. HAPNER:

5   Q.   All right.  So your testimony today is that of the seven

6   transactions that Agent Wisnaskas has identified as relevant to

7   this case, only one of them was made to another gold rusher?

8   A.   That is correct.

9   Q.   All right.  Would you agree with me that all of these

10  payments were to pay a commission to Alex?

11  A.   That is correct.

12  Q.   You don't know who any of these people are?

13  A.   That is correct.

14  Q.   Your commission to Alex is for him bringing you into gold

15  rushing?

16  A.   That is correct.

17  Q.   And you said you owed Alex approximately a hundred dollars

18  for every gold rush?

19  A.   That is correct.

20  Q.   So you made these payments about every three or four runs?

21  A.   That is correct.

22  Q.   If you thought this was a legitimate investment company,

23  why did you have to pay Alex a commission for being a courier?

24  Shouldn't the investors be the ones paying the commission?

25  A.   I mean, I'm sure they are paying their commissions, but

 1  this was just me for him handling me.  That's what I was told,

 2  and I just followed.

 3  Q.   What was what you were told?

 4  A.   That this --

 5  Q.   To make the payments?

 6  A.   -- is the commission I got to pay.

 7  Q.   Okay.  Did he ever tell you what to write in the memo line?

 8  A.   Not -- no.

 9          MR. HAPNER:  Can we expand that, please, on the right

10  side.

11  BY MR. HAPNER:

12  Q.   This second payment here, that was not for groceries, was

13  it?

14  A.   No.

15  Q.   The fourth payment, that was not for groceries, was it?

16  A.   No.

17  Q.   The fifth payment, that was not for rent, was it?

18  A.   No.

19  Q.   The sixth payment, that was not for clothes, was it?

20  A.   No.

21  Q.   And the seventh payment, that was not for utilities, was

22  it?

23  A.   No.

24  Q.   This was Alex directing you to make payments to other

25  people for various reasons that you did not know, and this was

SATHAWANE - CROSS

1   your way of making those payments on his behalf?

2   A.   That is correct.

3   Q.   Why couldn't Alex make these Zelle payments for himself?

4   A.   I have no idea.

5   Q.   During this trial, you heard numerous victims testify about

6   how they were defrauded.  You would agree with me that those

7   victims were lied to?

8   A.   That is correct.

9   Q.   You would agree with me that they were defrauded?

10  A.   That is correct.

11  Q.   Did you believe Bond was the one communicating with them?

12  A.   I don't believe so, but I don't know at this point.

13  There's at least 20 names that have been said out, so I don't

14  know.

15  Q.   You don't even know who was talking to them?

16  A.   To the people?

17  Q.   To the people who gave you the cash and gold.

18  A.   I haven't spoken to anyone, so.

19  Q.   You would agree with me that you were not told the same

20  type of lies as the victims in this case?

21  A.   I was told the same type of lies --

22  Q.   Were you told --

23  A.   -- as the victims.

24  Q.   I'm sorry?

25  A.   I was told the same type of lies as the victims as well.

SATHAWANE - CROSS

```
 1   Q.   You were told you had an outstanding arrest warrant?

 2   A.   No, I was told that I was taking gold to a jewelry shop.

 3   Q.   Were you told that you were a victim of identity theft?

 4   A.   No.

 5   Q.   Were you told that if you didn't comply with Alex or Bond's

 6   instructions, you would have to pay back significant tax debt?

 7   A.   No.

 8   Q.   So when you did these gold rushes, you did them

 9   voluntarily, right?

10   A.   Yes.

11   Q.   No one held a gun to your head and said you have to do

12   these rushes?

13   A.   No.

14   Q.   You did the gold rushes so that you could make money?

15   A.   That is correct.

16   Q.   And, in fact, you said it was the easiest way to make

17   money.

18   A.   That is correct.

19   Q.   You said if you do four hours of work, you could make the

20   same money you would make doing like three weeks of work at

21   minimum wage.

22   A.   That is true.

23   Q.   And you did it, in your words, because you were greedy?

24   A.   That is correct.

25   Q.   And you wanted that money to be debt free?
```

SATHAWANE - CROSS

1    A.    That is correct.

2              MR. HAPNER:  I'm almost done.

3    BY MR. HAPNER:

4    Q.    All right.  I want to end talking about the YouTube videos.

5              Can we see Exhibit 24, please.

6              You recall going over this exhibit, correct?

7    A.    That is correct.

8    Q.    And when you received this video, whether or not you

9    watched it in its entirety, you could see the title of the

10   video, couldn't you?

11   A.    That is correct.

12   Q.    And the title of that video is "Indian Scammer Steals 400K

13   in Gold Bars, Gets Busted," correct?

14   A.    That is correct.

15   Q.    And you responded to that, This is the reel I sent you in

16   November.

17   A.    That is correct.

18   Q.    And your testimony is that you sent a shortened version of

19   that to Kuts previously in November via Instagram?

20   A.    That is correct.

21   Q.    And in that shortened version, you saw the, as you

22   characterized it, the individual being harassed, right?

23   A.    I did not say harassed.  I said the individual in question.

24   Q.    The individual -- what was happening to the individual in

25   question?

SATHAWANE - CROSS

```
1    A.    He was being questioned.

2    Q.    I'm sorry.  I thought you called it a bullying video --

3    A.    It was.

4    Q.    -- because of the way he --

5    A.    But it was people bullying him.  It wasn't the officers

6    doing it.

7    Q.    I'm sorry.  That's why I said harass, but I'll say

8    bullying.

9             So it's a bullying video, and you would agree with me

10   it's the same guy in this image right here?

11   A.    Yes.

12   Q.    And in that image, because we watched the whole video

13   today -- I think I know the part you're talking about.  In that

14   part, he is interacting with police officers, right?

15   A.    That is correct.

16   Q.    And he's being arrested?

17   A.    Yes.

18   Q.    So you saw that --

19   A.    He was being questioned.

20   Q.    -- in the --

21   A.    He was being questioned.  He wasn't being arrested at that

22   point.

23   Q.    He was still being detained and questioned by police

24   officers about his activities?

25   A.    That is correct.
```

SATHAWANE - CROSS

1   Q.   And then you received this after the fact, and the title of

2   the video is "Indiana Scammer Steals 400K in Gold Bars, Gets

3   Busted"?

4   A.   That is correct.

5   Q.   And then you sent your own YouTube video, and the title of

6   that is "Indian Scammer Busted by Cops at Victim's Front Door"?

7   A.   That is correct.

8   Q.   And actually, before I go to that one, did you testify that

9   you did watch less than one minute of the -- of this video that

10  Kut sent you on February 9th?

11  A.   Yes.

12  Q.   So you would agree with me that if we watch that -- one

13  minute of that video again --

14  A.   Mm-hmm.

15  Q.   -- it very clearly says within the first minute that this

16  is a fraud?

17  A.   Uh-huh.

18  Q.   If the jury wants to -- if the jury wants to watch the

19  YouTube video that's in evidence today and they watch only the

20  first minute, the very first minute of that video says it's

21  an -- it's an elderly person speaking to an officer who is

22  seated in his car, right?

23  A.   Mm-hmm.

24  Q.   And the officer tells him this is -- he says, I gave away

25  gold bars, and the officer tells him this is a fraud.

SATHAWANE - CROSS

1    A.    That is correct.

2    Q.    So you saw that?

3    A.    That is correct, but I didn't know what background was.    I

4    didn't know what was happening.    So the only person who could

5    I -- I actually talked to is Bond and Alex, and that's whom I

6    contacted to ask if this was what was happening.

7    Q.    All right.    And then you sent the second video, and is it

8    your testimony today you have no idea what was depicted in that

9    video?

10   A.    I didn't watch the whole video.    I just sent it to him in

11   hopes that I'd go back and watch it.

12   Q.    Okay.    Well, you saw in the video -- would you agree with

13   me you saw in the video that there's an individual being

14   arrested who was going to pick up gold bars?

15   A.    That is correct.

16   Q.    And he's told that that's a fraud?

17   A.    That is correct.

18   Q.    Right.    And then he claims that he doesn't have any

19   knowledge of what's going on?

20   A.    That is correct.

21   Q.    Sir, isn't it true that when you got brought into this, you

22   were told expressly that you have nothing to worry about because

23   the way this fraud scheme is set up is that people like you who

24   go to pick up the cash and gold know that as soon as you're

25   arrested, all you have to do is say I have no idea what's going

1  on, I do not know --

2            MS. CONTRERAS:  Objection, Your Honor.  It calls for a

3  legal conclusion.

4            THE COURT:  The objection's overruled.

5            THE WITNESS:  No.

6            MR. HAPNER:  I don't think I finished the question.

7            THE COURT:  Why don't you just start the question

8  again.

9  BY MR. HAPNER:

10 Q.   Isn't it true, Mr. Sathawane, that from the very beginning

11 when you were talking about these types of gold rushes with

12 people like Kuts US and your friends, you were -- and then

13 eventually Bond and Alex, they told you, you have nothing to

14 worry about because if you ever get picked up for picking up

15 somebody's cash and gold, just like you did with Mr. Oliver, all

16 you have to say is I don't know what's going on, I have no idea?

17 A.   No.

18 Q.   That's not true?

19 A.   That's not true.

20            MR. HAPNER:  Can I have one moment?

21            No further questions.

22            THE COURT:  Any redirect?

23            MS. CONTRERAS:  Yes, Your Honor, but I would ask for a

24 break before redirect, if possible.

25            THE COURT:  Well, let me ask the jurors.  We're

SATHAWANE - CROSS

```
 1   going -- we haven't been going quite two hours, and we'll have
 2   to --
 3           Anybody on the jury ready for a break?
 4           THE JURY:  (Nodding heads.)
 5           THE COURT:  Okay.  We'll take a break.
 6           Leave your pads there, and we'll be back with you
 7   shortly.  Again, don't talk about the case and don't form any
 8   premature conclusions.
 9       (Jury excused.)
10           THE COURT:  I was reluctant to have a break just
11   because if you're -- we're going to have to break again, and
12   we're trying to get through this today.  We've got closings.
13   All this took longer than predicted.  So let's just sort of walk
14   through the rest of the day.
15           Your redirect is going to be how long?
16           MS. CONTRERAS:  I don't think -- I mean, it sort of
17   depends on his answers, but it shouldn't take longer than 15
18   minutes.
19           THE COURT:  Okay.  You can have a seat, Mr. Sathawane.
20           All right.  And then what we'll do, we'll just -- you
21   plan to rest after that?
22           MS. CONTRERAS:  Yes, Your Honor.
23           THE COURT:  Okay.
24           MS. CONTRERAS:  Well, renew my motion for JOA, but we
25   can do that --
```

1          THE COURT:  Well, not till you rest, right?

2          THE WITNESS:  Once I rest, yes.

3          THE COURT:  Okay.  So after you rest, we'll have a

4    sidebar.  We can deal with that, and then we'll go right into

5    the rebuttal case, which is going to be how long?

6          MR. HAPNER:  Maybe two minutes.

7          THE COURT:  Okay.  Just one of your agents?

8          MR. HAPNER:  Correct.

9          THE COURT:  Okay.  And then while we're here, I guess

10   let's -- I made the final draft instructions available to you

11   all, and the verdict form, on the break a minute ago.

12         Have y'all looked at those?

13         MR. HAPNER:  I received this right before we started

14   with her -- second half of her direct, so I have not had a

15   moment to look at it.

16         THE COURT:  Okay.  Well, look at that on this break

17   because then what we'll do is roll right into at least

18   instructions and then probably have a break and do closings all

19   in one swoop.  That's what we'll do.

20         Anything further?

21         MR. HAPNER:  Nothing from the Government.

22         MS. CONTRERAS:  Nothing, Your Honor.

23         THE COURT:  All right.  Then be back at a quarter till

24   by that clock, please.

25         (Recess taken from 3:32 p.m. to 3:46 p.m.)

SATHAWANE - CROSS

1          THE COURT:  Everyone have a seat.

2          Before we bring the jury back in, let me just hear if

3  there's any issues with the jury instructions that we have not

4  already talked about.

5          Mr. Hapner?

6          MR. HAPNER:  Not from the Government.

7          MS. CONTRERAS:  Not from the defense, Your Honor.

8          THE COURT:  And I know you had said on the deliberate

9  ignorance you may want to revisit it after all the evidence is

10  in.  I can tell you I think it's unlikely anything would change,

11  but you can do that at a sidebar, too, if you just want to have

12  a record of that; or if something does change, we can talk about

13  that too.

14          And the verdict form's okay with you?

15          Did you look at the verdict form, Mr. Hapner?

16          MS. CONTRERAS:  I'm sorry, Your Honor.  I don't think

17  I got the verdict form.

18          MR. HAPNER:  I don't recall receiving it either.

19          THE COURT:  Okay.  Well, we -- no, it was in that

20  separate folder.

21          Okay.  Well, take a quick look at that before we bring

22  the jury back in.

23          Oh, I will also alert you all to a couple of other

24  small changes I made to the instructions just so you're aware.

25          So on page 7 where we define use of interstate wire

communications, the previous version just said something would

normally be sent through wire, radio, or television

communications.  I just took out radio or television.  There's

no evidence of that, so it just says wire communications.

Everything else is the same.

       And then on -- if I look on page 8, there's a

definition of transaction.  It says it means a purchase, sale,

loan, et cetera.

       There was a lengthy second sentence in the pattern

that I've omitted.  It said a transaction with a financial

institution also includes a deposit, withdrawal, transfer

between accounts, exchange of currency, loan, extension of

credit, use of a safe deposit box, or purchase or sale of any

stock, bond, or certificate of deposit or monetary instrument.

       I struck that just as unnecessary here.

       So those are two additional changes I just want to

make you all aware of.

       Any issues with that, Mr. Hapner?

       MR. HAPNER:  No, Your Honor.

       THE COURT:  Ms. Contreras?

       MS. CONTRERAS:  No, Your Honor.

       THE COURT:  All right.  So then we have what should be

the final jury instructions.  You each have a copy of them,

correct?

       MR. HAPNER:  Yes, I have the jury instructions we just

1    talked about, yes.

2              THE COURT:  Great.  Then what we'll do --

3              You can come back up here, Mr. Sathawane, and have a

4    seat in the witness stand, and then we'll bring the jury back

5    out.

6         *(Jury present.)*

7              THE COURT:  All right.  Welcome back, everyone.  Have

8    a seat.

9              Our witness is still under oath, and so we'll just

10   continue with the -- or begin with the redirect.

11             Ms. Contreras, whenever you're ready.

12             MS. CONTRERAS:  Yes, Your Honor.

13                        **REDIRECT EXAMINATION**

14   BY MS. CONTRERAS:

15   Q.   Hi again, Mr. Sathawane.

16   A.   Hello.

17   Q.   You testified during cross that you paid Dhruv Gabani --

18   you Zelled Dhruv Gabani.  And to Zelle him, you took the money

19   from the cash?

20   A.   That's correct.

21   Q.   Why didn't you question that?

22   A.   It was -- like, Bond let me know about it, and he was the

23   one who was dealing with it.  So he said do it and you'll get --

24   like, you will get your share, so you won't lose any money on

25   it.  So I didn't question him.

SATHAWANE - REDIRECT

1   Q.   Relatedly, when you took your payment from the cash, what
2   did you think was happening there?
3   A.   I figured it was like a shipping charges that were getting
4   taken out, and then the rest of the cash was being used for
5   whatever the purpose was.
6   Q.   Did you believe Bond himself was selling gold?
7   A.   I don't think so.
8   Q.   During cross, the Government brought up the fact that
9   during the first proffer you said you didn't know the names of
10  anyone involved, correct?
11  A.   Yes, ma'am.
12  Q.   Why didn't you say the names of anyone involved?
13  A.   At that time, I did not want to get my friends involved in
14  this too.  I was already going through a lot.  It was really a
15  hard ordeal for me to just witness everything that happened to
16  me, and I didn't want to put my friends through it as well.
17  Q.   Which friends?
18  A.   Yash and Jones.
19  Q.   Yash and Jones.
20        How long have you know Yash?
21  A.   I know him for the past couple years.  I would say two and
22  a half, three years now.  But I hang out with him every day, go
23  to the gym every day.
24  Q.   What about Jones?
25  A.   I grew up with Jones.  We went to same schools.  We went to

1    soccer camps together.  We applied to the same schools but ended

2    up getting scholarships in two different colleges.

3    Q.   You also during your first police interview, you told

4    Detective Torres you had done this around ten times?

5    A.   That is right.

6    Q.   Why did you -- why did you lie?

7    A.   That was -- I'm really ashamed of lying that day because I

8    now realize that I shouldn't have done it.  But at that day, it

9    was -- it was -- like, I was really surprised.  I was shocked.

10   One moment I was waiting for the package to come up, and the

11   next thing I know is seven, eight police vehicles were right in

12   front of me.  There was like multiple law enforcement officers

13   with big guns pointing at me, and they were shouting orders.

14         I let them know that I was unarmed.  I had nothing on

15   me, but I was still like pushed forward onto a hood of the car,

16   and my hands were handcuffed basically.  And then I still

17   wasn't -- like, they still hadn't taken the guns down.  So I was

18   too afraid at the moment.  I have never dealt with, like, guns

19   personally.  It's just once that I was in Texas, that's when I

20   actually had my first interaction with them, and they really

21   scared me out.

22         So when I saw -- like when I saw them pointing the

23   guns at me, my -- I just couldn't think straight no more.  And

24   then even during the ride back to the PD, the officer

25   transporting me wasn't a -- I think I -- he just -- I cannot

1    find the words to, like, not disrespect him and still be

2    correct, but he just wasn't, let me just say, helping me out or

3    anything.  He was just being rude.

4            They just pushed me into the vehicle.  I tried to let

5    him know that, hey, the handcuffs are too hard.  I cannot, like,

6    move or anything.  They just said sit tight.  I had to ask where

7    we are going and didn't get no answers.  So.

8    Q.   So you were saying you were shocked and scared?

9    A.   That is correct.

10   Q.   Let's talk about your relationship with Bond.  Well, at

11   first, who was a stranger.

12   A.   Yes.

13   Q.   But how did that relationship develop?

14   A.   As I said earlier, like over the time, by being in constant

15   contact, he used to talk to me like -- he associated like

16   anecdotes from his life.  He used to tell me what he's doing,

17   like, what he's going to do, what car he drives, what was his

18   plans are.  He used to ask me about those.

19           And then the holidays and stuff come around, he wishes

20   me for my birthday, he made sure he gave me a call, and he --

21   basically he befriended me without actually giving me any

22   information.  And I still really fell for it.  I did not

23   understand what he was doing at the time.  I considered him --

24   like, I really thought that he was actually said -- doing what

25   he said he was doing, and I -- that's why I started to believe

1    him.  I started to trust him.

2         Secondly, like when he told me about the gold and when

3    I was mostly delivering it to the jewelers, it made sense to me

4    that, oh, he's actually telling me the truth because those are

5    the jewelers we're dealing with.

6         So that was why I trusted him.  I feel dumb and stupid

7    right now, but at the moment, I felt I made the right decision.

8    Q.   How often did you talk on the phone with Bond?

9    A.   Almost every day.  Like, even if I did not work, even if

10   there were no pickups, he used to call me, just check up on me,

11   just make sure I was doing fine.  And then just -- he used to

12   just keep me updated that I'll give you a call if something

13   shows up.

14   Q.   And how long were the phone calls?

15   A.   Anywhere between 45 seconds to four minutes, two hours,

16   depending on what was happening.

17   Q.   When you were on the phone with him for hours, what did you

18   talk about?

19   A.   The one distinct conversation I remember is one night I was

20   heading towards the dropoff, and he was just telling me about

21   his life, that -- what he's going through.  He wants to get

22   settled down.  He wanted to clubbing, and he was just unfolding

23   his life plans, like you talk -- like sit down and chat with

24   your friends.  So that's what, like, made me believe him a

25   little bit more because I thought he was upfront and forthcoming

1    with me.

2    Q.    You thought he was opening up to you?

3    A.    Yeah.

4    Q.    So Bond was a fake name?

5    A.    Yes.  It could have been a nickname, but it's -- at the

6    moment, I thought it's just a pet name or a nickname that they

7    go by.

8    Q.    Did you ask him his real name?

9    A.    No.

10   Q.    Why not?

11   A.    I mean, at the moment I was in school.  98 percent people I

12   know, I don't know their first names.  We just go by their last

13   names or their nicknames.  So it doesn't like -- like, it

14   doesn't click to me as if it's something different.

15   Q.    During cross, the Government asked some questions about the

16   first call when you asked what was happening, right?

17   A.    That is correct.

18   Q.    And you started doing the job October 2024?

19   A.    That is correct.

20   Q.    You couldn't remember who you called?

21   A.    That is correct.

22   Q.    So October 2024 was almost exactly a year ago?

23   A.    Yeah.

24   Q.    So that was a call that happened one year ago?

25   A.    That is correct.

SATHAWANE - REDIRECT

1    Q.    And you couldn't remember it?

2    A.    That is correct.

3    Q.    All right.  You mentioned you were also working at UPS.

4    A.    That is true.

5    Q.    Also under the table?

6    A.    That is correct.  I know the family who owned it.

7    Q.    Was this an off-the-books job?

8    A.    That is correct.

9    Q.    Did you get an employment agreement with UPS?

10   A.    No.

11   Q.    Did you get background-checked by UPS?

12   A.    No.

13   Q.    Did you get any paperwork showing you were working at UPS?

14   A.    No.

15   Q.    Just like with your gold rush job?

16   A.    That is true.

17   Q.    During cross, the Government showed some text messages when

18   you were joking about doing, like, one last job?

19   A.    That is correct.

20   Q.    You were talking about taking the 60,000?

21   A.    Mm-hmm, that is correct.

22   Q.    Did you take the 60,000?

23   A.    No.

24   Q.    Why not?

25   A.    That was just like -- it's incorrect in principle because

SATHAWANE - REDIRECT

1   that's not mine to take in the first place.  And I really

2   believed that people are actually getting or buying and selling

3   gold and, like, they were actually getting something in return.

4   So I -- like, I never intended to defraud anyone or, like, I

5   didn't meant to cheat anyone out of their hard-earned money.

6           I know how hard it is to make money as well.  So I was

7   content with the money I was making because that was hardest

8   way, driving six hours on the job.  It was challenging at the

9   time.  So, like, it never occurred to me to take their money

10  because I wouldn't deprive anyone of stuff like that.  I think

11  it just simply isn't fair.

12  Q.   So the jokes you were making about it, they were jokes?

13  A.   The group chat is named Alcoholics Anonymous, so it -- like

14  it's shit-talking every day.

15  Q.   Okay.  During cross, the Government also talked about a few

16  times you were not paid for the driving.

17  A.   That is correct.

18  Q.   When you were not paid, what did you think was going to

19  happen?

20  A.   I mean, I trusted Bond at that point.  He used to say that,

21  hey, listen, I'll get you paid the next time you go for a run,

22  so don't worry about it.  And I took his word for it, just as

23  the way they took my word for it when they hired me.

24  Q.   During cross, there was also -- the Government showed an

25  exhibit with Zelle payments, right?

1    A.    That is correct.

2    Q.    And you testified -- or it was shown in the Government's

3    exhibit that it had a memo?

4    A.    Yes.

5    Q.    The memo said groceries, rents, or clothes?

6    A.    Yes.

7    Q.    Why did it say that?

8    A.    In the November, if I recall correctly, Zelle transactions,

9    like the portal, they updated their policy, and each time now

10   that you will send something by Zelle, you need to put in a

11   memo.  And the four options that you see -- utilities,

12   groceries, rent -- those were the default options that actually

13   pop up above your typing screen.  So I just clicked one and sent

14   it.  I didn't really think --

15   Q.    What do the options look like?

16   A.    Those are just bubbles.  It's groceries, rent, utilities,

17   and I think there's something more at the end.

18   Q.    Does it say those words?

19   A.    Yeah, it says those words and it has the emoji with rent, I

20   believe.

21   Q.    During cross, at one point you testified you were told the

22   same type of lies as the victims.

23   A.    That is correct.

24   Q.    What did you mean?

25   A.    The victims also believed that their gold was going to a

1    legitimate place to -- like for being safeguarded.  It was the

2    same for me.  I was believing that I was sending the gold to a

3    jeweler to actually do something with it and, like, return the

4    money or go to the victim.  But it never happened.  Like, I

5    never -- I had no idea that that's what's -- that, like, that

6    was what was happening.  I really thought and considered that

7    they are legitimate operation.

8    Q.   After watching the YouTube videos, who did you call?

9    A.   I did not watch the YouTube videos all the way, but I

10   called Bond.

11   Q.   And he said you had nothing to worry about?

12   A.   Basically, I asked --

13           MR. HAPNER:  Objection, leading.

14           THE COURT:  Just a minute.  Overruled.

15           MR. HAPNER:  I can rephrase, Your Honor.

16           THE COURT:  Well, it's overruled.  You can go ahead,

17   but don't lead.

18           You can go ahead and answer.

19   BY MS. CONTRERAS:

20   Q.   What did Bond say?

21   A.   I asked him -- like, I read him the title, and I asked him,

22   like, hey, what is this about?  I say, are you sure, like, there

23   is nothing wrong happening?  And he basically said that, no, no,

24   no.  There's nothing wrong.  Like, we are actually working with

25   the businessmen.

1          And then he proceeded to gaslight me by just giving me

2     an example of the Bliss jeweler.  He was like, why would an

3     established businessman put himself in the middle of an illegal

4     activity like that?  That will make him lose all of it.  And

5     that seemed a reasonable enough explanation to me at the moment.

6          And the next thing he said was he looked at me as a

7     younger brother, and he wouldn't -- never put me in a position

8     to do something like that.

9     Q.   He looked at you as what?

10    A.   As a younger brother.  And I stupidly believed it at the

11    time, because at that point, I had been talking to him for four

12    months.  I thought I knew what he planned to do with his life,

13    and he wanted to settle down and everything.  So, I mean, it

14    sounded true to me at the time.

15    Q.   Would you have done this if you knew what was happening?

16    A.   No.  I would have never taken this job if I know this was

17    what was happening or this was what was the scope of everything.

18    It was never my intention to steal or cheat anyone.  Like, as

19    we -- as we came across multiple times, that I could have just

20    drove away with the gold and just not looked back, but that's

21    not -- that's not who I am, that's not what I wanted to do.  I

22    was content with what I was doing because I was getting paid for

23    the work I put in, and that seemed fair enough.

24          MS. CONTRERAS:  No further questions, Your Honor.

25          THE COURT:  All right.  Thank you, sir.  You can

1    return to your table.

2        *(Witness excused.)*

3        *(End of excerpt.)*

4                    * * * * * * * *

5

6                **REPORTER'S CERTIFICATION**

7

8        I hereby certify that the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
     the above-entitled matter, pursuant to the provisions of Section

9    753, Title 28, United States Code.

10

11   *Julie A. Wycoff*                        10/9/25

12   _____    _____
     Julie A. Wycoff, RMR, CRR          Date
     Official U.S. Court Reporter

13

14

15                    **I N D E X**

16   Defense Witnesses

17   ATHARVA SATHAWANE

18           Direct Examination by Ms. Contreras .................2

19           Cross-Examination by Mr. Hapner ...................47

20           Redirect Examination by Ms. Contreras ............137

21

22

23

24

25